2005-NMCA-075

114 P.3d 329

**Margie GRINE, on behalf of and as surviving spouse of Gary C. Grine, deceased, Claimant–Appellant,**

v.

**PEABODY NATURAL RESOURCES, dba Lee Ranch Coal Company, and Old Republic Insurance Company, Employer/Insurer–Appellees.**

**No. 24,354.**

Court of Appeals of New Mexico.

April 8, 2005.

Certiorari Granted, No. 29,196, June 2, 2005.

Gerald A. Hanrahan, Albuquerque, for Appellant.

Katherine E. Tourek, French & Associates, P.C., Albuquerque, for Appellees.

## OPINION

CASTILLO, J.

{1} In this workers' compensation case, we review the dismissal of Worker Gary Grine's claim, based on the determination that the heart attack he suffered on the job did not arise out of or occur in the course and scope of his employment. We must first decide the threshold issue of an employer's right to choose a health care provider for a worker when the employer has denied the worker's claim. Because we hold that NMSA 1978, § 52–1–49 (1990), authorized the employer in this case to select a health care provider for Worker, notwithstanding employer's denial of Worker's claim, and because the testimony of the provider furnished the requisite evidence that work-related stress factors did not contribute to or trigger the heart attack, we affirm the dismissal of Worker's complaint with prejudice.

## I. WORKER'S ISSUES ON APPEAL

{2} Worker suffered his heart attack on October 2, 2000, filed his claim for benefits on July 16, 2001, and died a little more than a year later, on June 21, 2002. Margie Grine (Margie), Worker's surviving spouse, was substituted as Claimant to continue to assert Worker's claims and to assert her own claims to death benefits. Margie is the appellant in the case; however, for purposes of this appeal, we will refer to her as Worker.

{3} Worker appeals from the Workers' Compensation Administration (WCA) to this Court for review of the compensation order that dismissed Worker's complaint with prejudice. This appeal is taken against Worker's employer, Peabody Natural Resources, dba Lee Ranch Coal Company, and its insurer, Old Republic Insurance Company (together referred to as Appellees). On appeal, Worker argues (1) that there was ample evidence that work-related stress triggered Worker's heart attack and that the Workers' Compensation Judge (WCJ) erred as a matter of law in requiring a higher standard of proof; (2) that under whole record review, the evidence supports the conclusion that numerous work-related stress factors contributed to or triggered Worker's heart attack and that the WCJ's decision to the contrary was clearly against logic and reason; (3) that pursuant to Section 52–1–49 of the Workers' Compensation Act (Act), NMSA 1978, §§ 52–1–1 to –70 (1929, as amended through 2004), the WCJ erred by permitting Appellees to switch Worker's treating physician; (4) that the WCJ erred by allowing Appellees' treating physician to testify, in violation of Section 52–1–51(C) of the Act; and (5) that Worker's rights to due process, equal protection, and a fair trial were violated by the wrongful actions of the current WCA director. We organize Worker's issues into three: health care providers, causal link between the heart attack and employment, and violation of constitutional rights. The facts related to each issue are contained in the appropriate section.

## II. DISCUSSION

### A. Appellees' Referral to Dr. Shadoff and the Admission of His Report and Deposition

{4} We first address the issue related to health care providers. We begin with the

pertinent facts. Although Worker was not aware of it, his heart attack occurred during his shift on October 1–2, 2000. After obtaining permission to leave work because he was feeling bad, Worker left work shortly after 1:30 a.m. on October 2, drove himself home, and went to sleep. On the morning of October 2, Worker saw Margie's doctor, Dr. Cubine, because Worker thought he was still experiencing heartburn. Dr. Cubine did not diagnose Worker's heart attack. Rather, she felt that Worker had stomach problems, ordered an upper GI to be performed in ten days, and gave Worker some medicine to drink. He still did not feel well, and on the evening of October 3, 2000, he went to the emergency room at Cibola Hospital in Grants, and it was determined that he had suffered a heart attack. Worker was then airlifted to the Heart Hospital of New Mexico in Albuquerque. He was treated for coronary artery disease the following morning, and an angioplasty was performed. Initially, Worker sought treatment from the Heart Hospital of New Mexico, the New Mexico Heart Institute, and his own physician, Dr. Orchard. On July 16, 2001, more than nine months after the heart attack, Worker filed a workers' compensation complaint. Up to the time of the filing of the complaint, Appellees had not directed any of Worker's health care.

{5} Appellees denied liability. In its October 17, 2001, answer to Worker's complaint, Appellees set forth a number of affirmative defenses—denying that Worker was hurt on the job, that there was any causal link between disability and accident, and that Worker's heart condition was work related or aggravated at work. Appellees requested that Worker's complaint be dismissed in whole. The WCA assigned Judge Joan O'Connell as the WCJ to hear Worker's case.

{6} Appellees raised the issue of health care providers by filing a motion in limine to exclude all medical records of the Heart Hospital of New Mexico, the New Mexico Heart Institute, and Dr. Orchard or, in the alternative, to allow a second opinion or an independent medical examination. After a hearing on December 10, 2001, the WCJ denied Appellees' request for an independent medical evaluation, a second opinion, or appointment of an expert witness but did allow Appellees to select a health care provider to treat Worker. In its order, the WCJ concluded that under Section 52–1–49(B), Appellees did not initially select a health care provider for Worker because it had denied liability for Worker's injuries. The WCJ further concluded that Worker had selected his own health care provider for the alleged injury of October 2, 2000: Dr. Orchard and physicians at the Heart Hospital of New Mexico and the New Mexico Heart Institute. The WCJ also concluded that no conflict existed between authorized medical providers and that an independent medical examination was therefore not authorized. Appellees' right to select a health care provider to treat Worker was based on a "reservation of rights," allowing Appellees to select a health care provider without admitting the compensability of the claim under the Act. In addition, the WCJ concluded that Appellees must pay for any medical care offered to Worker under Section 52–1–49 and that the records of such care would be admissible under Section 52–1–51(C). In reaching this conclusion, the WCJ observed that two of the purposes behind Section 52–1–49 are (1) to ensure that each party may select a doctor to provide medical care and inform the WCJ about relevant medical issues and (2) to limit the number of medical providers who may treat Worker, in order to prevent expensive and time-consuming litigation.

{7} Understanding the order to have allowed Worker to have already made the choice of first health care provider, Appellees issued a notice of change of health care provider to Worker on January 16, 2002. Appellees wanted Worker to be treated by Dr. Shadoff. Worker objected to this notice and asserted that Appellees made the initial selection of physicians or waived its right to do so under Section 52–1–49 and 11.4.4.11 NMAC (2005). Additionally, Worker stated that by denying his claim to benefits, Appellees had no right to change treating physicians under Section 52–1–49. Thus, Worker requested that Appellees' attempt to change treating physicians be denied.

■ {8} Based on the WCJ's conclusion that Appellees' initial selection of a health

care provider was Dr. Shadoff, the WCJ issued an order sustaining Worker's objection to Appellees' notice of change and ordered Worker to cooperate with the treatment offered by Dr. Shadoff. We conclude that because Appellees' choice of health care provider was its initial choice under Section 52–1–49(B), there was no need for Appellees to execute a notice of change under Section 52–1–49(C). Further, the WCJ referred to 11.4.4.11(C)(2)(c) NMAC, which characterizes medical treatment provided to a worker before the employer's written decision under Section 52–1–49(B) as "authorized health care."

■ {9} Worker contends that because Dr. Shadoff is not a properly authorized health care provider under Section 52–1–49, his testimony concerning Worker's heart attack under Section 52–1–51(C) is not admissible and that the WCJ could therefore only rely on the testimony of expert Dr. Orchard. We agree with Worker that determination of this issue is pivotal to this case. Section 52–1–51(C) states that "[o]nly a health care provider who has treated the worker pursuant to Section 52–1–49 . . . may offer testimony at any workers' compensation hearing concerning the particular injury in question." If Dr. Shadoff were not a qualified health care provider, the WCJ would not be able to rely on his testimony.

{10} This determination depends on the meaning of the language in Section 52–1–49. "Interpretation of statutory language is a question of law[, which] this Court reviews de novo." *Ramirez v. IBP Prepared Foods*, 2001–NMCA–036, ¶ 10, 130 N.M. 559, 28 P.3d 1100; *see Bajart v. Univ. of N.M.*, 1999–NMCA–064, ¶ 7, 127 N.M. 311, 980 P.2d 94. "In interpreting the meaning of a statute, we endeavor to give effect to the legislature's intent." *Ramirez*, 2001–NMCA–036, ¶ 10, 130 N.M. 559, 28 P.3d 1100. We observe that the workers' benefit system in New Mexico is based on "a mutual renunciation of common law rights and defenses by employers and employees alike." NMSA 1978, § 52–5–1 (1990). The legislature has declared that the Act is not remedial and is not to be construed to favor one party over another. *Id.* "[W]e examine the wording of the

statute and consider the statute's history and background." *Ramirez*, 2001–NMCA–036, ¶ 10, 130 N.M. 559, 28 P.3d 1100.

{11} Section 52–1–49 states in pertinent part:

> A. After an injury to a worker and subject to the requirements of the Workers' Compensation Act . . ., and continuing as long as medical or related treatment is reasonably necessary, the employer shall, subject to the provisions of this section, provide the worker in a timely manner reasonable and necessary health care services from a health care provider.
>
> B. The employer shall initially either select the health care provider for the injured worker or permit the injured worker to make the selection. Subject to the provisions of this section, that selection shall be in effect during the first sixty days from the date the worker receives treatment from the initially selected health care provider.
>
> C. After the expiration of the initial sixty-day period set forth in Subsection B of this section, the party who did not make the initial selection may select a health care provider of his choice. Unless the worker and employer otherwise agree, the party seeking such a change shall file a notice of the name and address of his choice of health care provider with the other party at least ten days before treatment from that health care provider begins. The director shall adopt rules and regulations governing forms, which employers shall post in conspicuous places, to enable this notice to be promptly and efficiently provided. This notice may be filed on or after the fiftieth day of the sixty-day period set forth in Subsection B of this section.

Section 52–1–49(A)–(C).

{12} In 1990, the Act was rewritten, and the pertinent sections concerning the selection of a health care provider were changed. *Ramirez*, 2001–NMCA–036, ¶¶ 11–12, 130 N.M. 559, 28 P.3d 1100. "In making these revisions, the legislature set forth an orderly process for the treatment and examination of injured workers that gives both parties the opportunity to control the medical treat-

ment." *Id.* ¶ 12. "The legislature has provided a procedure for when a party does not agree with the choice of a health care provider." *Id.* ¶ 16. "Section 52–1–49 mandates that an employer ... provide an injured worker reasonable and necessary health care services and establishes the procedures by which the worker's health care provider is selected and changed." *City of Albuquerque v. Sanchez*, 113 N.M. 721, 723, 832 P.2d 412, 414 (Ct.App.1992).

{13} We agree with Worker that neither the Act nor our case law specifically states whether a denial of a claim prohibits an employer from selecting a health care provider. However, based on our review of the statute and regulations, Section 52–1–49 must be read to allow the employer and the worker each to make a selection of a health care provider at some point in a case. The employer's right to make this selection would be eliminated if we were to adopt Worker's interpretation of the statute. We also find support in a WCA regulation, which characterizes medical treatment provided to the worker before the employer's written decision under Section 52–1–49(B) as "authorized health care." 11.4.4.11(C)(2)(c) NMAC. This regulation contemplates allowing an employer to exercise its rights under Section 52–1–49(B), even though the worker may have already obtained medical treatment before the employer makes its choice under the statute. *See* 11.4.4.11(C)(2)(c) NMAC. Accordingly, we find no error in the WCJ's determination that Dr. Shadoff was Appellees' initial selection of a health care provider and that his testimony was properly admitted.

## B. Causal Link Between Worker's Heart Attack and His Employment

{14} Worker presents two arguments regarding the cause of his heart attack. First, he argues that under whole record review, the evidence supports Dr. Orchard's opinion that work-related stress factors contributed to or triggered Worker's heart attack and that the WCJ erred by deciding otherwise. Worker also contends that the WCJ erred as a matter of law by requiring proof that the stress precipitating Worker's heart attack

must have been "acute stress." Appellees assert that there was substantial evidence to support the WCJ's decision and that the WCJ did not base its determination solely on the acute-stress issue. As in Section A, we begin with the facts pertinent to this issue.

{15} From 1985 until the heart attack, on October 2, 2000, Peabody Natural Resources (Employer) employed Worker as a blade operator at Employer's coal mine, located in a remote area about forty-one miles west of Grants, New Mexico. A blade is a heavy-equipment vehicle, somewhat similar to a bulldozer. The blade vehicle is used to cut and maintain roads for huge haul trucks that transport dirt from the excavation site to a dump site. The vehicle is about twenty feet high and weighs several tons. A blade operator generally drives the vehicle back and forth over the haul roads to keep the road surface in good condition for the haul trucks. A blade operator primarily blades roads that are approximately one half to one mile long with a width of 120 to 140 feet. The blade has an automatic transmission, with a climate-controlled cabin area, where the operator sits and manipulates the blade vehicle. When operating, the blade is moving at approximately six miles per hour. Employer has not experienced any blade rollovers, and the operators are not in fear of such a rollover. Nor are blade operators in fear of avalanches. A blade operator has not killed any person on the ground at Employer's mine.

{16} For several years prior to October 2, 2000, Worker was required to work for twelve hours per day for four consecutive days. He would then have four days off, unless directed to work overtime. During the first two four-day periods, Worker was required to work from 7:00 a.m. to 7:00 p.m. After two four-day periods, he was then required to work from 7:00 p.m. to 7:00 a.m. for the following two four-day periods. Worker's schedule rotated every two four-day periods thereafter. Worker had been on the rotating four-day schedule for several years. His work hours remained about the same while he was on this schedule. For example, Worker worked 1,481.5 hours from January 3, 1999, to October 3, 1999, and he worked

1,487 hours from January 2, 2000, to October 1, 2000. While at work, Worker was entitled to a thirty-minute lunch break, though he stated that he usually ate his lunch while operating his blade. Although he was never told by Employer that he could not take breaks, Worker typically worked his twelve-hour shift with few or no breaks, which he considered stressful. Employer did not enforce any regular system of fifteen-minute rest breaks. Worker claimed that the long hours were stressful and confused his body.

{17} Worker had to commute to work. In order to arrive at work by 7:00 a.m./p.m., Worker had to leave his home by 5:30 a.m./p.m. He would return home by 8:00 a.m./p.m. Thus, including commuting time, Worker worked approximately 14.5 hours a day during his work periods. Worker asserted that because of this long work schedule, he became sleep deprived, fatigued, and physically and emotionally stressed.

{18} Employer had mandatory overtime, and as an hourly employee, Worker was required to work mandatory overtime. Mandatory overtime begins with volunteers who want to get their overtime out of the way, and then a rotation occurs in which employees who have not signed up for the overtime get assigned to the remaining overtime. Employer attempts to keep the amount of overtime even for all employees. Worker did not volunteer for overtime; consequently, he was sometimes assigned overtime without much advance notice. Worker asserted that the required overtime was stressful.

{19} In late June 2000, Worker's immediate supervisor, Ernest Ortiz (Ortiz), informed Worker that he had some vacation days remaining and that he needed to schedule some time off from work soon. Worker understood that he had four days available and took time off from work the following week. When Worker returned to work, he was informed that he needed to report immediately to the new production manager, Carl McMinn (McMinn). McMinn accused Worker of taking an unearned and unauthorized day of vacation time, thereby stealing money from the company. Worker maintained that McMinn threatened to fire him if he missed one more day of work. McMinn acknowledged that he had this heated exchange of words with Worker and admitted he was angry and raised his voice while speaking to Worker; however, McMinn considered Worker to be a good friend and a person who helped him learn the coal business. This confrontation upset Worker, and he asserted that he continued to brood over this incident until his heart attack. In fact, Worker contended that he lived in fear of losing his job if he missed even one day of work for any reason. That said, Worker did report to work every day after the exchange with McMinn; however, Worker did go home on sick leave in early September 2000 after 1.5 hours of work. He also knew Employer had no history of firing workers for taking sick days. Worker interacted with McMinn on a friendly basis between July and September 2000.

{20} Worker was scheduled to work the 7:00 p.m. to 7:00 a.m. shift on October 1–2, 2000, the day of his heart attack. He was not feeling well but, despite the advice from Margie, did not call in sick and went to work. On the night of October 1, Worker complained of heartburn to some co-workers. Ortiz testified he saw Worker standing outside his blade and smoking a cigarette, though Worker denied that he had been smoking. Worker said he was having stomach problems and had just vomited. When Ortiz asked if Worker wanted to go home, he responded that he felt okay and that he wanted to continue to work. Worker testified that subsequently he was not feeling well at all and that his attempts to notify Ortiz were unsuccessful.

{21} In fact, Worker suffered a heart attack in the late hours of October 1 or the early hours of October 2. He radioed Ortiz around midnight for assistance. There was no response. Worker radioed again, and still no assistance was provided. Finally, around 1:30 a.m., Worker drove his blade to the change house and spoke directly to Ortiz. Worker informed Ortiz that he was not feeling well, and Ortiz essentially told him to go home and not to bother him. Employer did not provide any on-site medical treatment to Worker. Worker returned home. The facts regarding the provision of subsequent health

care to Worker are explained above, in section II of this opinion.

{22} After Worker's death, the matter of his complaint came before the WCJ for a hearing on June 13, 2003. The main question was whether there was a causal link, as a matter of reasonable medical probability, between Worker's heart attack on October 2, 2000, and his employment. After considering all the evidence and arguments, including the depositions and records of both Dr. Orchard and Dr. Shadoff, the WCJ entered findings of fact, upon which it concluded that Worker's "heart attack on October 1–2, 2000, did not arise out of, or occur in the course and scope of, Worker's employment with Employer." The WCJ found that Worker was not under any unusual emotional or physical stress from his work hours. Further, the WCJ determined that "[t]here is no causal link between the Worker's heart attack and employment as a matter of reasonable medical probability" and dismissed Worker's complaint with prejudice. Worker appeals from this decision.

### 1. Standard of Review

{23} Our standard of review is upon the whole record. *Garcia v. Borden, Inc.*, 115 N.M. 486, 491, 853 P.2d 737, 742 (Ct.App.1993). Under whole record review, this Court "views the evidence in the light most favorable to the agency decision but may not view favorable evidence with total disregard to contravening evidence." *Nat'l Council on Comp. Ins. v. N.M. State Corp. Comm'n*, 107 N.M. 278, 282, 756 P.2d 558, 562 (1988) (internal citation omitted). We must "find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Id.* "Substantial evidence on the whole record is such evidence that demonstrates the reasonableness of the administrative decision." *Herman v. Miners' Hosp.*, 111 N.M. 550, 552, 807 P.2d 734, 736 (1991). If "substantial evidence supports the findings of the hearing officer, an appellate court will not disturb those findings on appeal." *Id.*

### 2. Work–Related Stress

{24} NMSA 1978, § 52–1–28(B) (1987) requires that "[i]n all cases where the employer or his insurance carrier deny that an alleged disability is a natural and direct result of the accident, the worker must establish that causal connection as a probability by expert testimony of a health care provider." In this case, the burden was therefore on Worker to provide medical evidence showing that his heart attack and death was a "medically probable result of the work-related stress." *Herman*, 111 N.M. at 552, 807 P.2d at 736. In *Oliver v. City of Albuquerque*, 106 N.M. 350, 352, 742 P.2d 1055, 1057 (1987), our Supreme Court noted that when a preexisting condition is aggravated by employment-related stress, the requirement of a work-related injury is met. Although there is no requirement that a worker must prove "that stress was the only factor causing the . . . heart attack," a worker must "show that the heart attack more likely than not was the result of stress." *Herman*, 111 N.M. at 553, 807 P.2d at 737; *see also Bufalino v. Safeway Stores, Inc.*, 98 N.M. 560, 565, 650 P.2d 844, 849 (Ct.App.1982).

{25} Here, the WCJ was faced with conflicting medical evidence. Dr. Orchard continued to treat Worker until his death, and Dr. Orchard believed that while Worker had coronary artery disease caused by plaque that had built up in his arteries, work-related stress was a factor that triggered Worker's heart attack. In Dr. Orchard's February 15, 2001, letter, he stated the following:

> The circumstances of [Worker's] work at [the time of the heart attack] were such that he was under extreme stress, both mental and physical, and long hours. The conditions that he worked under, while not being the sole cause for his heart attack, certainly may have been a precipitating factor. . . . [I]t is a likely probability that [Worker's] work conditions may have precipitated his myocardial infarction, although of course would not have been responsible for the plaque that was the original culprit.

{26} Dr. Orchard also testified that he did not review Worker's prior medical rec-

ords, did not talk about Worker's work in great detail, and was not familiar with Worker's work history, the nature of his job, or his employment records. Further, Dr. Orchard testified (1) that a heart attack can occur without any precipitating factors; (2) that he did not know of any acute-stress event on October 1, 2000, involving Worker; (3) that based on Worker's long-standing work schedule, Dr. Orchard could not say stress was the event that caused the heart attack on October 2, 2000; and (4) that he did not discuss Worker's heart attack as being work-related until January 2001.

{27} Dr. Shadoff met with Worker once and concluded, as had Dr. Orchard, that Worker had coronary artery disease. However, based on a review of all of Worker's medical records, his history of risk factors for heart attack, such as smoking and diabetes, his work environment and work history, and medical literature, Dr. Shadoff determined to a reasonable degree of medical probability that the October 2, 2000, heart attack was not work related, but rather was a random event.

{28} Dr. Shadoff testified that Worker's schedule would not be a stressful event that would trigger a heart attack "because this was the kind of cycle that he had [ ] been working for a number of years." Dr. Shadoff further stated that Worker's fear of being fired for taking time off after McMinn admonished Worker was not a stressful event that caused his heart attack. Rather, Worker may have had a chronic sense of stress. Therefore, Dr. Shadoff disagreed with Dr. Orchard's opinion that "[i]f the events [the argument with McMinn and long work hours] as [Worker] told them to me are accurate, then I feel that there is a medical probability that the stress of those circumstances precipitated this heart attack and his eventual death." The disagreement was based on a reasonable medical probability. Based on medical studies and other literature, Dr. Shadoff stated that the temporal relationship between the physical or emotional stress and the triggering of myocardial infarction is important and that Worker's attack was a random event. Dr. Shadoff testified that he might concur with Dr. Orchard's opinion on

causation if Worker's heart attack had occurred within twenty-four hours of his being threatened with termination by McMinn and being accused of stealing a day's pay from Employer. Instead, Dr. Shadoff tied the heart attack to risk factors, such as smoking, diabetes, and Worker's continued risky behavior, even though he had been advised to stop smoking and watch his diet. While Dr. Shadoff only met with Worker on one occasion, the doctor did review Worker's prior medical records and understood the nature of Worker's job.

{29} Where there is conflicting evidence from both experts, it is within the discretion of the WCJ to reach a determination of medical probability. *See Bufalino,* 98 N.M. at 565, 650 P.2d at 849. Reviewing the record as a whole shows that there was sufficient evidence to support the WCJ's conclusion that as a matter of reasonable medical probability, there was no causal link between Worker's heart attack and his employment.

{30} The WCJ's findings of fact demonstrate that the WCJ disbelieved Worker's testimony that he was stressed. Further, the WCJ found that Dr. Orchard was not familiar with Worker's job conditions or his past medical history. Therefore, the WCJ relied on Dr. Shadoff's testimony that Worker's hours and the incident with McMinn did not cause the heart attack and that smoking and diabetes were significant risk factors. In addition, Dr. Orchard agreed that a person achieves equilibrium if he performs a task over and over and that it is "very hard to say that chronic stress will cause a heart condition." Thus, the WCJ agreed with Dr. Shadoff that Worker's heart attack was a "random event to a reasonable degree of medical probability." "The rule is established that where conflicting medical testimony is presented as to whether a medical probability of causal connection existed between myocardial infarction and work being performed, the trial court's determination will be affirmed." *Id.* at 565, 650 P.2d at 849.

### 3. Acute Stress

{31} Worker additionally argues that the WCJ erred in basing its determination solely

on the lack of an acute-stress event occurring within a short time before Worker's heart attack. We disagree with Worker's characterization of the WCJ's determination. As described above, the WCJ did consider a number of factors, including Worker's contention that the long work hours and his confrontation with McMinn contributed to the heart attack. The following evidence was presented on this contention. Worker testified that in the last five years of his employment, there was nothing different in the physical work he had been doing; however, he did feel that more was expected of him. As far as the work schedule and long hours, Worker stated that he did not realize he was experiencing stress from working his "four-on, four-off" work schedule until after his October 2, 2000, heart attack. Further, Worker testified that he thought the stressful event he alleged in his complaint was the incident with McMinn. Moreover, during the May 14, 2001, telephonic interview, when Worker was asked whether he had been doing anything stressful at work or had been involved in any argument prior to the heart attack, he responded, "O[ ] my god, no. We all got along good. I mean, even the boss." Thus, the record demonstrates that the WCJ considered evidence of Worker's alleged stress but was not persuaded. Although the WCJ addressed acute-stress factors in its decision, we do not read the dismissal to be based on a requirement that only events of acute stress can cause a heart attack. The WCJ's conclusion was general in nature: Worker failed to establish that the cause of his heart attack was work-related stress. We therefore reject Worker's argument that the WCJ held him to a higher standard of proof.

### C. Violation of Worker's Rights by the WCA Director

{32} Worker argues that his rights to due process of law, to equal protection under the law, and to a fair trial before an independent and impartial judiciary, as well as other fundamental and statutory rights, were violated by the wrongful actions of the current WCA director and the structure of the WCA. Worker also contends that the Act itself is unconstitutional, but he does not present any argument that the WCJ who heard the case acted unfairly, arbitrary, capriciously, or with bias. *See Colonias Dev. Council v. Rhino Envtl. Servs., Inc.*, 2003–NMCA–141, ¶¶ 35–47, 134 N.M. 637, 81 P.3d 580 (discussing the alleged bias of the hearing officer when the plaintiff argued that hearing officer's bias violated the plaintiff's constitutional right to due process and a fair hearing). Nothing in the briefs supports Worker's contention that he received an unfair trial. Worker's argument that his constitutional rights were violated by the staff appointment procedure is a political question and is not justiciable. *See State ex rel. Coll v. Johnson*, 1999–NMSC–036, ¶ 24, 128 N.M. 154, 990 P.2d 1277 (discussing that generalized insinuations of governmental wrongdoing did not set forth a clear legal duty to perform the actions the plaintiffs sought). The legislature is responsible for enacting laws that set forth the terms for the administration of the workers' compensation scheme. Worker provides no legal support for the contention that the Act and its administration are unconstitutional, and we presume the Act is constitutional. *Madrid v. St. Joseph Hosp.*, 1996–NMSC–064, ¶ 10, 122 N.M. 524, 928 P.2d 250.

### III. CONCLUSION

{33} For the foregoing reasons, we affirm the WCJ's decision.

{34} **IT IS SO ORDERED.**

BUSTAMANTE, C.J. and ALARID, JJ., concur.