This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-37460

**ANNA M. ROMERO,**

Worker-Appellant,

v.

**ST. VINCENT HOSPITAL,**

Employer/Self-Insured-Appellee.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Shanon S. Riley, Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Appellant

Hale & Dixon, P.C.
Timothy S. Hale
Albuquerque, NM

for Appellee

### MEMORANDUM OPINION

**DUFFY, Judge.**

{1}     Anna M. Romero (Worker), then employed as a housekeeper with St. Vincent Hospital (Employer), was injured at work on May 11, 2006, when she slipped while mopping a wet floor, twisting her right foot and ankle. Over the next eleven years, Worker and Employer litigated various aspects of the workers' compensation benefits to which Worker was entitled. Worker appeals from several of the Workers' Compensation Judge's (WCJ) orders, raising multiple issues. We affirm in part and reverse in part.

**DISCUSSION**

**{2}** Before turning to the merits of the issues raised on appeal, we note that our review of Worker's arguments was hindered by Worker's failure to cite to the record in her brief in chief. We remind counsel of the importance of complying with our Rules of Appellate Procedure, *see* Rule 12-318(A)(3), and that this Court "will not search the record for facts, arguments, and rulings in order to support generalized arguments," even when conducting a whole-record review. *Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104. The rules set forth requirements that are necessary to allow this Court to review and address threshold matters of preservation, as well as the merits of the issues raised on appeal, as efficiently and thoroughly as possible. A failure to adhere to those requirements results in the consumption of scarce judicial resources, particularly given the volume of the record in this eleven-year-long case.

## I.      Initial Matters

**{3}** Turning now to the arguments raised by the parties, we summarily address two initial matters. First, we reject Employer's argument that Worker's appeal was untimely. Worker appealed after the WCJ issued an order awarding attorney fees on June 11, 2018, but raised challenges to two of the WCJ's earlier compensation orders, as well as a separate order on Worker's bad faith claims. In *Trujillo v. Hilton of Santa Fe*, 1993-NMSC-017, ¶ 4, 115 N.M. 397, 851 P.2d 1064, our Supreme Court held that a compensation order that did not resolve the issue of attorney fees was non-final for purposes of appeal. *See also Barela v. ABF Freight Sys.*, 1993-NMCA-137, ¶¶ 9-12, 116 N.M. 574, 865 P.2d 1218 (applying *Trujillo* and concluding that an employer could appeal from either the original compensation order or a subsequent order awarding attorney fees). In this case, the WCJ deferred resolution of the attorney fee issue until June 11, 2018, and Worker timely filed a notice of appeal thirty days later. We therefore conclude this Court has jurisdiction to consider Worker's appeal.

**{4}** Second, we dispose of Worker's argument that the WCJ improperly calculated her permanent partial disability (PPD) benefits by relying on the sixth, rather than the fifth, edition of the American Medical Association's guide to the evaluation of permanent impairment (AMA Guide). *See* NMSA 1978, § 52-1-26(A), (C) (1990, amended 2017); NMSA 1978, § 52-1-24(A) (1990). Worker stipulated to the WCJ's use of the sixth edition of the AMA Guide in a pretrial order dated February 15, 2017, and thus waived any argument concerning the district court's reliance on that edition of the AMA Guide.

## II.     Sufficiency of the Evidence

**{5}** Worker makes four arguments that we construe as challenges to the sufficiency of the evidence supporting the WCJ's factual findings. "[W]e review the whole record to determine whether the WCJ's findings and award are supported by substantial evidence." *Molinar v. Larry Reetz Constr., Ltd.*, 2018-NMCA-011, ¶ 20, 409 P.3d 956 (internal quotation marks and citation omitted). Applying the standard set forth in *Herman v. Miners' Hosp.*, 1991-NMSC-021, ¶ 6, 111 N.M. 550, 807 P.2d 734, we view the evidence in the light most favorable to the WCJ's decision. As long as substantial

evidence supports the WCJ's findings, "an appellate court will not disturb those findings on appeal." *Id.*

**{6}** Before turning to Worker's specific arguments, we address Worker's more general argument that the WCJ erred by not giving the opinions of her treating physicians greater weight than the opinions of the independent medical examiners (IMEs). The authority she relies upon does not stand for that proposition, *see Grine v. Peabody Nat. Res.*, 2006-NMSC-031, 140 N.M. 30, 139 P.3d 190; *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, 134 N.M. 421, 77 P.3d 1014, and to the extent Worker suggests the WCJ could not have ruled contrary to her treating physicians' testimony, we reaffirm that the WCJ was not required to take the testimony of her treating physician as true. *See Chapman v. Jesco, Inc.*, 1982-NMCA-144, ¶ 6, 98 N.M. 707, 652 P.2d 257 ("Medical testimony, like other expert evidence, is intended to aid but not to conclude the trier of the facts in determining the extent of disability." (internal quotation marks and citation omitted)). Instead, "weighing evidence and making credibility determinations are uniquely within the province of the trier of fact, [and] we will not reweigh the evidence nor substitute our judgment for that of the WCJ, unless substantial evidence does not support the findings." *Dewitt v. Rent-A-Ctr., Inc.*, 2009-NMSC-032, ¶ 22, 146 N.M. 453, 212 P.3d 341.

## A.    Hip and Lower Back Pain

**{7}** Worker contends that her workplace injury altered her gait, which caused hip and back pain. Worker argues that "[t]he WCJ erred by not ordering Employer to provide Worker with an evaluation of her hip and back pain pursuant to Section 52-1-49(A) (1990). The WCJ found that "Worker's right hip and lower back pain are not a natural and direct result of the May 11, 2006 work related accident." The WCJ quoted and agreed with the IME panel's opinion that "[Worker's] ongoing right hip complaint is not causally related to the May 11, 2006 injury since she does not ambulate with an altered gait. [Worker] possibly had temporary right hip pain when she ambulated with an antalgic gait."

**{8}** Worker argues that "[t]he WCJ erred by giving greater weight to the opinion of the IME provider (Dr. Mirmiran) rather than the surgeons (Dr. Blake & Dr. Schulhofer)." We have already addressed whether the opinions of treating physicians are entitled to greater weight than IME physicians. The remaining question is whether substantial evidence supports the WCJ's finding that Worker's hip and back pain were not caused by the work-related injury when this finding was based on the IME's opinion that Worker did not ambulate with an altered gait.

**{9}** "The rule is established that where conflicting medical testimony is presented as to whether a medical probability of causal connection existed between [the injury] and work being performed, the [district] court's determination will be affirmed." *Grine v. Peabody Nat. Res.*, 2005-NMCA-075, ¶ 30, 137 N.M. 649, 114 P.3d 329 (internal quotation marks and citation omitted), *rev'd on other grounds*, 2006-NMSC-031. Because there was medical testimony—the IME panel's report—that supported the

WCJ's decision, and because this is "sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the [WCJ,]" *see Herman*, 1991-NMSC-021, ¶ 6, we reject Worker's argument that other medical evidence required a different result. *See id.*

**{10}**　Further, while Plaintiff's treating physicians, Drs. Blake, Chavez, and Schulhofer, each testified to some degree of probability that Worker's hip pain was causally related to her workplace injury, we note that their testimony is based on examinations performed sometime prior to the IME. Worker points to evidence from September 26, 2007, to November 3, 2011; the IME took place on September 4, 2012. The IME physicians acknowledged prior reports that Worker's gait was abnormal, but did not observe that Worker had an abnormal gait at the time of the IME. Due to the passage of time, it is unclear whether the IME physicians' report conflicts with the earlier physician testimony—it is possible that Worker walked with an abnormal gait as late as 2011, but did not in 2012. To the extent the testimony does conflict, the earlier testimony does not render the WCJ's finding "manifestly wrong or clearly opposed to the evidence." *See Molinar*, 2018-NMCA-011, ¶ 20.

## B.　Psychological Impairment

**{11}**　Worker also contends that the WCJ erred by denying continuing medical benefits for Worker's psychological injuries. Worker makes two arguments. First, Worker argues, "[t]he WCJ erred by giving more weight to the opinions of the IME psychologists (Dr. Naimark & Dr. Granados) rather than the treating psychologist (Dr. Donovan)." Second, she argues, "the opinions of both Dr. Naimark and Dr. Granados should have been denied because they both applied wrong legal standards."

**{12}**　Assuming Worker intended this first argument to be that there was not substantial evidence for the WCJ's determination that "beyond June 1, 2016, Worker's psychological treatment, while beneficial, would not be related to her work injury[,]" we reject that argument because the medical evidence was conflicting and Dr. Granados's IME supported the WCJ's decision, as we explain in more detail below. As for Worker's second argument, she contends that Drs. Naimark and Granados applied the wrong legal standard by not recognizing that "[w]orkers are entitled to benefits, including medical treatment, for the resulting combination of a related[ ]accident and any pre-existing conditions." Workers are so entitled, *id.* ¶ 22, but as we explain, neither Dr. Naimark nor Dr. Granados failed to recognize this.

**{13}**　In the September 4, 2012 IME, Dr. Naimark diagnosed Worker with psychological conditions that he divided into two diagnoses: (1) "[p]ain [d]isorder associated with both psychological factors and a general medical condition with depressed and anxious features" and (2) "[b]ereavement." Dr. Naimark wrote, "The [p]ain [d]isorder is partially related to the May 11, 2006 injury. The diagnosis of [b]ereavement is unrelated to the job injury." To treat the pain disorder, Dr. Naimark recommended that Worker see a "psychologist or similarly trained professional who specializes in instruction with psychological pain control techniques. It is estimated [twelve to twenty] sessions would

be adequate for meeting her treatment needs. This recommendation for treatment is partially related to the May 11, 2006 job injury." To treat the bereavement, Dr. Naimark wrote:

> [Worker] should work with a pastoral counselor (one-to-one) to assist her with her grief reaction related to the loss of her son. This treatment is unrelated to the May 11, 2006 job injury. Her grief reaction has always been severe and was not aggravated or exacerbated by the job injury. Her nonworking status allows for more reflection on this problem[,] but the severity of the grief reaction remains unchanged.

Dr. Naimark thus divided Worker's psychological condition into two injuries: one caused by the workplace accident and another not caused by the workplace accident.

{14} In its first compensation order, the WCJ essentially agreed with Dr. Naimark, finding that "[a]s a natural and direct result of the accident of May 11, 2006, to a reasonable degree of medical probability, Worker suffer[ed] . . . [p]ain disorder[] and [m]ajor [d]epressive [d]isorder." The WCJ found the Worker also suffered from "bereavement[,]" but that Worker's bereavement was not a result of the May 11, 2006 accident. The WCJ concluded that "Worker has a continuing need for medical care for treatment of the work[-]related conditions as recommended by her authorized health care providers and their referrals."

{15} Dr. Naimark did not fail to recognize that, as Worker put it, "[w]orkers are entitled to benefits, including medical treatment, for the resulting combination of a related[ ]accident and any preexisting conditions." Rather, Dr. Naimark opined that Worker suffered from two separate psychological conditions: one "partially related to the May 11, 2006 injury[,]" and another neither caused nor exacerbated by the accident. Worker fails to recognize this distinction, suggesting instead that Dr. Naimark diagnosed Worker's psychological state as a single psychological condition that was present before the accident but was exacerbated by the accident.

{16} We turn to Dr. Granados' recommendation. Dr. Granados performed an independent psychological examination pursuant to the WCJ's order granting Employer's application for IME. Like Dr. Naimark, Dr. Granados diagnosed Worker with two psychological conditions: one partially caused by the 2006 workplace accident and one not caused by the accident. The condition that was partially caused by the workplace accident was Worker's "[m]ajor [d]epressive [d]isorder, moderate, without current suicidal ideation or psychotic features, and [s]omatic [s]ymptom [d]isorder, predominant pain, chronic." The condition that was not caused by the workplace accident was "other [s]pecified [t]rauma and [s]tressor-related [d]isorder, specifically as it pertains to the persistent complex [b]ereavement [d]isorder[,]" a diagnosis that was "equivalent to the previous[] diagnosis of [b]ereavement [d]isorder . . . as assigned by Dr. Naimark."

**{17}** Dr. Granados recommended that Worker's benefits for psychological injury end, but the reason for this recommendation was not Worker's pre-existing psychological condition, as Worker contends. To the contrary, Dr. Granados stated that "[Worker] reached [maximum medical improvement] from a psychological standpoint on . . . [October 9, 2014]." Dr. Granados said "[Worker] has had a reasonable and appropriate course of psychological treatment . . . between November 2012 and October 2014. If [Worker] has continued to visit with Dr. Donovan on a monthly or every[two-]month basis, those visits are considered reasonable and appropriate; however, it is proposed that no further psychological treatment be provided beyond June 2016." The WCJ agreed, reiterating that Worker's pain disorder and major depressive disorder were "a natural and direct result of the accident of May 11, 2006," but ordering that "Worker has received all of the psychological medical care which she is entitled to under the Workers' Compensation Act."

**{18}** In sum, neither Dr. Naimark nor Dr. Granados failed to recognize that "[w]orkers are entitled to benefits, including medical treatment, for the resulting combination of a related[ ]accident and any pre-existing conditions." Rather, Dr. Naimark recommended that Worker receive treatment for her pain disorder, which Dr. Naimark acknowledged was a combination of a work-related accident and a psychological condition that was present before May 11, 2006. Dr. Granados recommended that treatment cease, but such recommendation was not because of Worker's pre-existing psychological condition but rather because Worker had already received a "reasonable and appropriate course of psychological treatment[.]" Because the reason for any limitation or denial of treatment for a work-related psychological injury was never the fact that that injury was an exacerbation of a pre-existing psychological condition, Worker's reliance on *Molinar* and other similar cases is misplaced. *See id.* ¶¶ 45-46 (noting that workers are entitled to benefits even when an injury is an exacerbation of a pre-existing condition).

**{19}** For these reasons, we perceive no error in the WCJ's decision to deny continuing medical benefits for Worker's psychological injuries.

## C.     Calculation of PPD Benefits

**{20}** Worker contends the WCJ "erred in assessing Worker's [PPD] benefits . . . by not finding that Worker's loss of physical capacity was from heavy to sedentary." We construe this argument to be that there was not substantial evidence for the WCJ's finding that Worker's physical capacity before the injury was medium as opposed to heavy.

**{21}** The calculation of PPD is based in part on a comparison of the worker's physical capacity before and after the injury. NMSA 1978, § 52-1-26.1 (1990); NMSA 1978, § 52-1-26.4 (2003). In general, if an injury causes a greater change in physical capacity, a worker is awarded a greater PPD benefit. *See* § 52-1-26.1. "Heavy" capacity is "the ability to lift over fifty pounds occasionally or up to fifty pounds frequently[.]" Section 52-1-26.4(C)(1). "Medium" capacity "means the ability to lift up to fifty pounds occasionally or up to twenty-five pounds frequently[.]" Section 52-1-26.4(C)(2). In the February 14,

2014 compensation order, the WCJ found that "Worker's usual and customary work, before injury, was at a *medium* level of exertion." After the workplace injury, Worker was at sedentary capacity. Worker contends the accident reduced her capacity from *heavy* to sedentary.

**{22}** Contrary to Worker's suggestion that the only evidence presented on this issue was her own testimony that she lifted up to fifty pounds and occasionally lifted over fifty pounds, the WCJ made several findings indicating Worker's capacity before the workplace injury was not heavy based on Worker's prior injuries and restrictions. For example, the WCJ found, "[p]rior to the May 11, 2006 accident, Worker fell in a parking lot and severed nerves in her right hand, Worker sustained a rotator cuff tear of her right shoulder when a case of toilet paper fell on her shoulder, and Worker fell off her Mother's stairs[,] tearing ligaments and tendons in her right knee[.]" Worker underwent surgeries for each of these injuries. As the WCJ noted, "Worker testified that she has continuously experienced pain in her right shoulder and right knee since each of those accidents" and that "while she was employed at Quail Run, as a housekeeper, prior to the May 11, 2006 accident, she 'would only do certain parts of the job and the other person with her would do the other parts' because they knew she had restrictions[.]" On appeal, Worker does not challenge any of these findings. The WCJ credited Worker's testimony, stating that "in the course of her employment with Employer she was required to lift, carry and push heavy items[,]" but wrote that "the [c]ourt remains unpersuaded that Worker's weight estimates were accurate" or that "Worker was capable of lifting greater than fifty pounds given her preexisting injuries[.]"

**{23}** Viewing the WCJ's unchallenged findings in the light most favorable to the WCJ's decision, we hold that substantial evidence supports the WCJs determination that Worker was at medium capacity prior to injury.

## D.    Scheduled Injury Benefits

**{24}** Worker argues the WCJ erred as a matter of law in its award of scheduled injury benefits under NMSA 1978, Section 52-1-43 (2003). The WCJ found that "[a]s a natural and direct result of the accident of May 11, 2006, to a reasonable degree of medical probability, Worker suffers right ankle sprain/pain[.]" Further, the WCJ found that "Worker underwent three surgeries to her right foot and ankle as a result of the May 11, 2006 accident and continues to experience pain in her right ankle." For this injury, the WCJ determined that Worker's impairment rating was 7 percent of the lower extremity. The WCJ concluded that pursuant to Section 52-1-43(A)(32), Worker is entitled to 115 weeks of scheduled injuries benefits for her right foot at the ankle and that Worker's loss of use for the right foot is 14 percent, including the 7 percent impairment. *See id.* (providing 115 weeks for injury to one foot at the ankle).

**{25}** Worker contends that she sustained a permanent injury to her Achilles and peroneal tendons and that the WCJ should have awarded her an additional 130 weeks of scheduled injury benefits pursuant to Section 52-1-43(31) (providing 130 weeks for injury to one leg between the knee and ankle), and that the award should have been at

80 percent. To the extent Worker argues that the percentage for her impairment rating should be higher, we read Worker's argument to be that there was not substantial evidence for the WCJ's finding that Worker's impairment rating was only 7 percent. Without any citation to the record, Worker describes her own testimony regarding the severity of her injury to her foot and ankle and the impact of this injury on her life, suggesting that her impairment rating must have been higher. The evidence on which the WCJ relied for this finding was the recommendation from the 2012 IME. Viewing the WCJ's finding in the light most favorable to the WCJ's decision, we hold that the WCJ could have accepted the IME report to the extent it conflicted with Worker's own testimony; therefore, we will not disturb the WCJ's finding. *See Herman*, 1991-NMSC-021, ¶ 6.

**{26}**    We also reject Worker's argument that the WCJ erred in awarding only 115 weeks for an injury to Worker's foot at the ankle under Section 52-1-43(32), and not an *additional* 130 weeks for an injury to an injury to one leg between the knee and the ankle under Section 52-1-43(31), for two reasons. First, we do not see where Worker argued below that she was entitled to two separate scheduled-injury benefits. She submitted proposed findings and conclusions that asked the WCJ to conclude that she suffered a "partial loss of use of her right leg below the knee" and was entitled to 130 weeks of benefits. The requested conclusion appears to be in lieu of, and not in addition to, a request for 115 weeks of benefits for the injury to her foot. Therefore, preservation of this issue is doubtful.

**{27}**    Even assuming for the sake of discussion that the issue is preserved, we find no support for Worker's argument that she suffered an injury between the knee and the ankle. Worker's initial argument in her brief in chief contained no citation to any evidence in the record. In her reply, she cited to an operative report of Dr. Blake, which discussed a surgery on the lateral aspect of Worker's right *foot* and noted a tear in her peroneal tendon. Worker also cited to the deposition testimony of Dr. Schulhofer for his discussion of an injury to Worker's Achilles tendon. In context, however, Dr. Schulhofer made clear that the injury was at the point where the tendon attached to the heel. He was asked specifically, "Is there any injury . . . to her shin or above the ankle?" He responded, "Not that I'm aware of." Worker provided no other citations to the record below. Consequently, we conclude that Worker has not established on appeal that she suffered an injury above the ankle or that she was entitled to 130 weeks of scheduled injury benefits. We affirm the WCJs findings regarding Worker's scheduled injury benefits.

### III.    Bad Faith Claims

**{28}**    From the outset of the proceedings below, Worker claimed that Employer engaged in bad faith and unfair claim-processing practices. *See* NMSA 1978, § 52-1-28.1(B) (1990) ("If unfair claim processing or bad faith has occurred in the handling of a particular claim, the claimant shall be awarded, in addition to any benefits due and owing, a benefit penalty not to exceed twenty-five percent of the benefit amount ordered to be paid."). The WCJ finally heard the matter in 2017 and rejected Worker's bad-faith

claims, writing in an order dated October 18, 2017, that "each of Worker's allegations are either time-barred and/or without merit[.]" Worker claims that the WCJ erred as a matter of law in concluding that any of her bad faith claims are time-barred. We agree. The WCJ's ruling on whether Worker's claims were time-barred presents a question of law that we review de novo. *Williams v. Stewart*, 2005-NMCA-061, ¶ 8, 137 N.M. 420, 112 P.3d 281.

**{29}** It is well settled in New Mexico that the filing of the complaint tolls the statute of limitations, and the statute remains tolled during the pendency of the action. *Bracken v. Yates Petroleum Corp.*, 1988-NMSC-072, ¶¶ 10, 12, 107 N.M. 463, 760 P.2d 155. As mentioned above, Worker first requested penalty benefits for Employer's bad faith conduct as part of her initial workers' compensation complaint, filed March 3, 2008. This included Worker's claim that Employer improperly terminated her benefits on August 12, 2007. Worker continued to request penalty benefits throughout the litigation, in filings in 2011 and in 2014, based on Employer's alleged continuing conduct. In at least two orders, the WCJ specifically noted that resolution of the bad-faith issue was deferred for a later determination. Consequently, because Worker's bad faith claims were properly pled and there is no indication in the record that the claims were dismissed or resolved prior to the WCJ's October 18, 2017 order, we fail to see how any of Worker's bad faith claims are time-barred. Accordingly, we hold that the WCJ erred as a matter of law in finding that some of Worker's bad faith allegations were time-barred.

**{30}** Although the WCJ's order indicates that the WCJ also found that some of Worker's claims lacked merit, the WCJ did not enter findings of fact or conclusions of law addressing any of the claims specifically. Consequently, we are unable to determine which claims the WCJ found unmeritorious and why, and we are therefore unable to review this aspect of the order. For this reason, we reverse the WCJ's denial of Worker's bad faith claims and remand for reconsideration of the entirety of Worker's allegations of bad faith and unfair claims processing, with further instructions to the WCJ to enter findings and conclusions specifying the basis of its ruling as to each claim.

## IV.    Attorney Fees

**{31}** Finally, Worker argues the WCJ erred in determining Worker's attorney fees. The WCJ found that there were two accidental injury claims in this matter and awarded Worker's attorney $45,000, payable 75 percent by Employer and 25 percent by Worker. Worker contends the WCJ erred by ordering Worker to pay 25 percent of the fee award.

**{32}** NMSA 1978, Section 52-1-54 (2013) governs attorney fee awards in connection with worker's compensation proceedings, and two subsections of this statute are relevant to our analysis. First, Section 52-1-54(I) sets a cap on the amount of attorney fees at $22,500 for a single accidental injury claim. Second, Section 52-1-54(F) is a fee-shifting provision, which provides that "[a]fter a recommended resolution has been issued and rejected . . . the employer or claimant may serve upon the opposing party an offer to allow a compensation order to be taken against the employer or claimant for the money or property or to the effect specified in the offer[.]" Section 52-1-54(F)(4) goes on

to say that "if the worker's offer was less than the amount awarded by the compensation order, the employer shall pay one hundred percent of the attorney fees to be paid the worker's attorney[.]"

**{33}** In this case, the WCJ issued three separate compensation orders, and Worker filed an application for attorney fees after the WCJ issued its third and final compensation order on March 21, 2017. In that application, Worker noted that she had conveyed two offers of judgment during the pendency of the action. She stated:

> Worker conveyed an [o]ffer of [j]udgment to Employer on October 24, 2008. Employer did not accept this offer. Worker obtained benefits in excess of her [o]ffer of [j]udgment through the [first] [c]ompensation [o]rder entered on . . . April 14, 2009.
>
> Worker conveyed a second [o]ffer of [j]udgment to Employer on November 21, 2013. Employer did not accept this offer. Worker obtained benefits in excess of her Offer of Judgment through the [second] [c]ompensation [o]rder issued on February 14, 2014.

**{34}** At the hearing on Worker's fee application, the WCJ orally ruled "that there are two separate accidents and that the cap in this case is $45,000." The WCJ further stated "that $22,500 is payable 100 percent by the employer/insurer to the worker['s attorney] and $22,500 . . . is payable 50 percent by the Worker and 50 percent by the employer/insurer." In the written order that followed, the WCJ found that Worker had obtained benefits in excess of her *first* offer of judgment, conveyed on October 24, 2008, pursuant to Section 52-1-54(F). The order was silent as to Worker's second offer of judgment, but the WCJ apparently concluded that Worker was not entitled to fee shifting for the second accidental injury.

**{35}** Worker's argument on this point is limited to a single sentence that reads: "[s]ince Worker obtained benefits in excess of her [o]ffer of [j]udgment, the WCJ erred by not ordering Employer to pay 100 [percent] of the attorney fee award[,] pursuant to NMSA 1978, § 52-1-54(F)[.]" Worker did not acknowledge on appeal, as she did before the WCJ, that she issued two separate offers of judgment that relate to two separate fee awards, nor did she address whether she obtained benefits in excess of the second offer. Instead, her briefing characterizes the $45,000 attorney fee award as a single award of fees, for a single accident, and states that she "conveyed *an* Offer of Judgment . . . [and] then obtained benefits in excess of *the* [o]ffer of [j]udgment." (Emphasis added.) This, of course, fails to address the core issue of whether the WCJ erred in declining to shift fees with respect to the second injury award. Because Worker has not provided any argument or authority on this point, we decline to address it further. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶¶ 70-71, 309 P.3d 53 (stating that appellate courts will not review undeveloped arguments).

**CONCLUSION**

**{36}** For the foregoing reasons, we remand to the WCJ for reconsideration of Worker's bad faith or unfair claims processing claims, but affirm on all other issues.

**{37}   IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**ZACHARY A. IVES, Judge**