907 P.2d 205

**Olga JURADO, Worker–Appellee,**

v.

**LEVI STRAUSS & COMPANY, A Self Insured, Employer–Appellant.**

**No. 15936.**

Court of Appeals of New Mexico.

Oct. 12, 1995.

Certiorari Denied Nov. 21, 1995.

James G. Chakeres, Albuquerque, for Worker–Appellee.

Bryan D. Evans, Atwood, Malone, Mann & Turner, P.A., Roswell, for Employer–Appellant.

## OPINION

WECHSLER, Judge.

1. This case arises out of a claim for benefits under the Workers' Compensation Act, NMSA 1978, §§ 52–1–1 to –70 (Repl. Pamp.1991) (effective January 1, 1991) (the Act). The principal issue is the admissibility of the written impairment report of Dr. Guy R. Fogel, who neither treated Worker nor provided an independent medical examination (IME). *See* §§ 52–1–49, –51(C). For the reasons discussed below, we reverse the Workers' Compensation Judge's (WCJ) denial of Employer's motion in limine with regard to Dr. Fogel's report and remand this case to the WCJ for new findings and conclusions pertaining to the remaining issues.

### Facts and Proceeding Summary

2. Worker suffered an accidental injury while sewing jeans at the "hem leg" station at Employer's plant in Roswell, New Mexico, on December 11, 1991. Worker's first report of accident states that her "bilateral hands and wrists" were injured due to "repetitive work." Worker also described pain in her neck. The primary diagnosis by Worker's initial treating physicians, Drs. Veitch and Lehman, was bilateral carpal tunnel syndrome. Worker ceased work with Employer on March 5, 1992, and has not returned to work. She received carpal tunnel release surgery on her right and left wrists in March 1992 and June 1992 respectively. Dr. Colocho, who performed the surgery in June 1992, found Worker to be at maximum medical improvement (MMI) on October 9, 1992, and noted that Worker's multiple symptoms were beyond his comprehension and inconsistent with the physical rehabilitation reports. He released Worker from regular treatment as of October 9, 1992.

3. On December 3, 1992, Dr. Bernstein, a physician selected by both parties, performed an IME on Worker. In Dr. Bernstein's opinion, Worker's hand, wrist, neck, and shoulder conditions were causally related to her December 11, 1991 accident. He also determined that Worker had not yet reached MMI. Dr. Bernstein did not designate any impairment ratings.

4. Dr. Allegretto, a general orthopedist, treated Worker in 1993 for the purpose of addressing all of her medical conditions. He determined that Worker had a "substantial amount of nonmeasurable complaints," and he thought that "her psychological overlay exaggerate[d] this." On May 14, 1993, Dr. Allegretto determined that Worker had reached MMI, assigned a 5% impairment rating to each upper extremity, which translates to a 6% impairment rating to the whole person, and released Worker from his care. Dr. Allegretto also determined that "[t]he neck complaints and trigger points [did] not correspond to peripheral or spinal nerve root areas, and therefore, [could] not be assigned an impairment rating." Worker complained to Dr. Allegretto of headaches, which the doctor stated were not in his area of expertise.

5. On September 17, 1993, Dr. Jakins, a general practitioner, concluded that Worker had reached MMI. He also indicated that he had no "objective explanation for her significant symptoms." In his deposition testimony, Dr. Jakins stated that he agreed with Dr. Allegretto's assessment that Worker did not show "many signs to warrant" a neck impairment. Dr. Jakins also stated: "My feeling on this woman is that she has become her disease."

6. On December 30, 1993, in response to Worker's attorney's request to arrange for another IME, Dr. Bernstein wrote to Worker's attorney:

I saw Ms. Jurado for a one time meeting in December, 1992. I have not seen her since that time. I am at present no longer doing IME's[.] My associate at the time, Dr. Guy Fogel, was doing IME's and he has moved to Lubbock, Texas. If he is still doing IME's he may be willing to see her. I am not sure who else is doing IME's in Albuquerque.

7. On January 18, 1994, Dr. Fogel examined Worker for "an impairment rating of the neck." Dr. Fogel's written report states that Worker was referred to him by her attorney for that specific purpose. It makes no mention of Dr. Bernstein or a referral by Dr. Bernstein. Dr. Fogel examined Worker after the attorneys and the WCJ agreed that

the issue of whether Worker was entitled to an impairment rating for the neck and shoulders, and thus entitled to permanent partial disability benefits rather than scheduled injury benefits, was a disputed medical issue and the crucial focus of the dispute between the parties. Dr. Fogel's report is accompanied by an affidavit of records custodian which is signed and acknowledged in accordance with Workers' Compensation Administration (WCA) Rule of Evidence 92.4.3E (Oct. 1992) (WCA Rule 92.4.3E). In his report, Dr. Fogel assigned a 5% permanent partial impairment rating to the body as a whole for Worker's neck and shoulder condition.

8. Prior to trial, Employer filed a motion in limine to exclude Dr. Fogel's written impairment rating report. Employer argued that Dr. Fogel's written report was inadmissible testimony within the meaning of Section 52–1–51(C) and the case law interpreting that section because it was neither testimony of an authorized health care provider under Section 52–1–49, nor testimony of an independent medical examiner agreed to by the parties or specified by the WCJ upon petition, as required under Section 52–1–51(A).

9. After a hearing, the WCJ denied Employer's motion in limine and allowed Dr. Fogel's written report to be admitted as evidence. During the hearing, the WCJ ruled in favor of admitting the report because (1) the report complied with the formal requirements of WCA Rule 92.4.3E, and, (2) as it was in writing, it did not constitute "testimony" to which the restrictions of Section 52–1–51(C) apply. In the findings and conclusions, however, the WCJ found that Dr. Bernstein had referred Worker to Dr. Fogel. The WCJ then concluded that Dr. Fogel's impairment evaluation report "did not constitute ongoing medical care and attention [or] an independent medical exam for diagnosis and treatment, but [was] undertaken to determine impairment ratings needed to calculate disability pursuant to the statutory formula."

10. In awarding permanent partial disability benefits to Worker under Section 52–1–42, the WCJ arrived at a 14% permanent partial disability rating by adding 3% for Worker's specific vocational preparation to the sum of the impairment ratings deter-

mined by Drs. Allegretto and Fogel (6% whole-body impairment due to Worker's injury to the hands and wrists and 5% whole-body impairment due to Worker's neck and shoulder condition). Worker's attorney was awarded attorney fees, in part due to his success in achieving permanent partial disability benefits rather than scheduled injury benefits for Worker. Worker was also awarded her costs for obtaining Dr. Fogel's impairment evaluation report on her neck and shoulders.

### Admissibility of Dr. Fogel's Impairment Evaluation Report

■ 11. For Worker to receive permanent partial disability benefits under Section 52–1–42, rather than scheduled injury benefits under Section 52–1–43, Worker must show that (1) she is totally disabled or (2) she has suffered a separate and distinct impairment to a nonscheduled body part. *See Hise Constr. v. Candelaria,* 98 N.M. 759, 760–61, 652 P.2d 1210, 1211–12 (1982); *Gomez v. Bernalillo County Clerk's Office,* 118 N.M. 449, 454, 882 P.2d 40, 45 (Ct.App.1994).

12. Worker did not argue below or on appeal that she is totally disabled. Instead, the pivotal medical issue in dispute was whether Worker was entitled to a neck and shoulder impairment, thus entitling her to permanent partial disability rather than scheduled injury benefits. Employer had paid Worker temporary total disability benefits up to May 13, 1993, and had paid her medical expenses. As of May 14, 1993, Employer began paying scheduled injury benefits.

■ 13. Worker makes two arguments that she has established a separate and distinct impairment to a nonscheduled body part. We address them in reverse order. Worker relies on *Lucero v. Smith's Food & Drug Centers, Inc.,* 118 N.M. 35, 878 P.2d 353 (Ct.App.), *cert. denied,* 118 N.M. 90, 879 P.2d 91 (1994), and contends that an impairment rating for the purpose of determining permanent partial disability benefits can be inferred from extrinsic medical evidence. We disagree. *Lucero* held that a claimant need not establish an impairment rating (i.e., loss of use expressed as a percentage) based on American Medical Association guides and publications to recover benefits for an injury to a specific scheduled member pursuant to the scheduled injury section. *Id.* at 38, 878 P.2d at 356. However, *Lucero* left untouched the requirement that a worker alleging permanent partial disability must establish an impairment rating for any separate and distinct nonscheduled body part(s) before being entitled to permanent partial disability benefits. *See* § 52–1–42(A), § 52–1–26(C) (setting out guidelines), § 52–1–24(A) (defining impairment based upon the American Medical Association guide); *Lucero,* 118 N.M. at 37, 878 P.2d at 355.

14. Worker's principal position relies on Dr. Fogel's written report as evidence that Worker suffered a separate and distinct impairment to a nonscheduled body part. Employer argues that the WCJ erred in allowing Dr. Fogel's report to be admitted over Employer's motion in limine because the written report constitutes testimony of neither a health care provider who treated Worker pursuant to Section 52–1–49, nor a health care provider conducting an IME pursuant to Section 52–1–51. We agree with Employer.

15. Section 52–1–51(A) reads in pertinent part:

A. In the event of a dispute concerning any medical issue, if the parties cannot agree upon the use of a specific independent medical examiner, either party may petition a workers' compensation judge for permission to have the worker undergo an independent medical examination.

16. Section 52–1–51(C) states:

C. Only a health care provider who has treated the worker pursuant to Section 52–1–49 NMSA 1978 or the health care provider providing the independent medical examination pursuant to this section may offer testimony at any workers' compensation hearing concerning the particular injury in question.

17. When a medical issue is in dispute, Section 52–1–51(A) provides for resolution through the use of an independent medical examiner. The statute also provides two methods for determining who the indepen-

dent medical examiner is to be: the parties may agree to the use of a specific independent medical examiner, or either party may petition the WCJ for permission to have the worker undergo an IME.

18. The parties agreed that Worker could undergo an IME by Dr. Bernstein. While Dr. Bernstein's IME report establishes the causal connection between Worker's complaints regarding her hands, shoulder, and neck and her job duties with Employer, Dr. Bernstein concluded that Worker had not reached MMI as of December 3, 1992, and he did not establish any impairment ratings for Worker. Worker's designated health care provider in 1993, Dr. Allegretto, determined that Worker had reached MMI on May 14, 1993, and gave her impairment ratings for both of her wrists. Worker's subsequent health care provider performing medical maintenance, Dr. Jakins, stated that the impairment rating Dr. Allegretto assigned to Worker was a "fair decision" and that Worker did not show "many signs to warrant" a neck impairment.

19. Worker does not dispute that Employer did not agree to allow Worker to undergo another IME with Dr. Fogel and that Employer did not know until after the fact that Worker visited Dr. Fogel. When, as here, the parties cannot agree, Section 52–1–51(A) specifically provides for either party to petition the WCJ for permission to undergo an IME. Section 52–1–51(A) does not allow the worker to make a unilateral decision as to which doctor to see for an IME.

20. Even if Dr. Bernstein's December 1993 letter listing names of possible physicians could be characterized as a "referral" from Dr. Bernstein, as the WCJ determined, or as a continuation, albeit two years later, of Dr. Bernstein's IME, as argued by Worker, we believe that Section 52–1–51(A) does not provide for such a referral or continuation without an agreement of the parties or by the WCJ upon petition by one of the parties. Since the parties did not utilize either of these methods, we believe that Dr. Fogel cannot be considered an independent medical examiner pursuant to Section 52–1–51(A). Nor can Dr. Fogel be considered to be Worker's health care provider treating Worker

pursuant to Section 52–1–49. Dr. Fogel was retained unilaterally by Worker's attorney for a one-time visit for the purpose of providing an impairment rating for Worker's neck and shoulder condition.

21. Dr. Fogel's written report, therefore, is not admissible unless it is not considered "testimony." At the hearing on the motion in limine, the WCJ determined that Section 52–1–51(C) did not apply to Dr. Fogel's written report because such written report did not constitute testimony. The WCJ relied on WCA Rule 92.4.3E.

22. We agree with Employer, however, that WCA Rule 92.4.3E merely provides a means by which medical records can be admitted into evidence in light of the WCA's prohibition against live physician testimony. *See Lopez v. City of Albuquerque,* 118 N.M. 682, 684, 884 P.2d 838, 840 (Ct.App.), *cert. denied,* 118 N.M. 533, 882 P.2d 1046 (1994) ("Rule 92.4.3E only addresses the procedures for admitting medical records."). This rule does not stand for the proposition that the medical opinions of a health care provider prepared in the form of a written report do not constitute testimony under Section 52–1–51(C). *See Lopez,* 118 N.M. at 685, 884 P.2d at 841 ("The VA [Veterans Administration] Center was not a health care provider authorized under Section 52–1–49, nor was it a health care provider conducting an independent examination of [w]orker at the order of the workers' compensation judge; consequently, it was not one of the only two types of health care providers which may provide testimony at compensation hearings."); *City of Albuquerque v. Sanchez,* 113 N.M. 721, 727, 832 P.2d 412, 418 (Ct.App.1992) ("[WCA] director has authority to adopt reasonable rules and regulations, and, if not inconsistent with the law, the rules and regulations are binding on the administration of the Workers' Compensation Act." (citing NMSA 1978, § 52–5–4(A) (Repl.Pamp.1991))).

23. In *Lopez,* this Court affirmed the WCJ's refusal to allow the VA Center's records into evidence. We did not specifically state in *Lopez* that the VA Center's written records were "testimony" within the meaning of Section 52–1–51(C). Our holding that the WCJ was correct in refusing to allow those

**806**

records into evidence presupposes that those records did constitute testimony, and that the relevant determination was whether those records constituted testimony of a health care provider under Section 52–1–49 or testimony of an independent medical examiner agreed to by the parties or selected by the WCJ upon petition.

24. Similarly, Dr. Fogel's impairment evaluation is testimony, but is neither the testimony of a health care provider under Section 52–1–49, nor the testimony of an independent medical examiner as provided by Section 52–1–51(A). The fact that it was "undertaken to determine impairment ratings needed to calculate disability pursuant to the statutory formula" does not mean that it is admissible. The Act does not authorize such an evaluation except in connection with ongoing care from authorized treating health care providers, Section 52–1–49, or IMEs in situations where medical issues are in dispute. Section 52–1–51. Dr. Fogel's impairment evaluation report is inadmissible testimony within the meaning of Section 52–1–51(C).

25. Additionally, Worker argues that Employer was not prejudiced by Dr. Bernstein's "referral" to Dr. Fogel because Employer had ample time to arrange for another IME prior to the trial of the case on October 6, 1994. She states that Employer chose to ignore the opportunity to have its own rating obtained and, instead, Employer objected to Dr. Fogel's impairment rating. However, Worker had the burden of establishing a separate and distinct impairment to a non-scheduled body part through compliance with the Act. She does not satisfy this burden by pointing out actions Employer could have taken. Worker also argues that Employer "abnegated its responsibility to the worker in failing to provide a qualified physician to determine whether there was an impairment." Worker did not argue to the WCJ that Employer did not comply with Section 52–1–49(A) by failing to provide timely and necessary health care services. We will not hear the issue unless it was preserved for appeal. *Cisneros v. Molycorp, Inc.,* 107 N.M. 788, 794, 765 P.2d 761, 767 (Ct.App.),

*cert. denied,* 107 N.M. 785, 765 P.2d 758 (1988).

26. We reverse the WCJ's denial of Employer's motion in limine.

### Remaining Issues

27. After the WCJ denied Employer's motion in limine and admitted Dr. Fogel's written report, he also decided that: (1) Worker reached MMI on September 17, 1993; and (2) Worker was entitled to (a) permanent partial disability benefits rather than scheduled injury benefits, (b) attorney fees, and (c) costs relating to Dr. Fogel's impairment evaluation. Since we hold that Dr. Fogel's written report should have been excluded from evidence, we remand the case to the WCJ for findings and conclusions with regard to these remaining issues in light of such exclusion. The WCJ shall also resolve Employer's issue concerning the award of $50 in costs.

28. **IT IS SO ORDERED.**

PICKARD and BUSTAMANTE, JJ., concur.