2006-NMSC-031

139 P.3d 190

**Margie GRINE, on behalf of and as surviving spouse of Gary C. Grine, deceased, Claimant–Petitioner,**

v.

**PEABODY NATURAL RESOURCES d/b/a Lee Ranch Coal Company and Old Republic Insurance Company, Employer–Insurer–Respondents.**

No. 29,196.

Supreme Court of New Mexico.

June 28, 2006.

Gerald A. Hanrahan, Albuquerque, NM, for Petitioner.

French & Associates, P.C., Katherine E. Tourek, Albuquerque, NM, for Respondents.

## OPINION

MINZNER, Justice.

{1} Margie Grine (Claimant), on behalf of and as surviving spouse of Gary Grine (Worker), deceased, appeals from the Court of Appeals' opinion, which affirmed the Workers' Compensation Judge's (WCJ) dismissal of Worker's claim for workers' compensation benefits. Worker sought benefits from his employer, Peabody Natural Resources, d.b.a. Lee Ranch Coal Company, and its insurer, Old Republic Insurance Company (Employer/Insurer), after he suffered a heart attack during his graveyard shift in October 2000. After Worker's death in June 2002, his wife, Margie, was substituted as the claimant to continue his claims and to independently assert her claims to death benefits.

{2} The WCJ concluded that Worker's on-the-job heart attack did not arise out of or occur in the course and scope of Worker's employment, and therefore, dismissed Worker's claim. Claimant appealed to the Court of Appeals, which held that there was sufficient evidence to support the WCJ's determination that, as a matter of reasonable medical probability, there was no causal link between Worker's on-the-job heart attack and his employment. *Grine v. Peabody Natural Res.*, 2005–NMCA–075, ¶¶ 1, 29, 137 N.M. 649, 114 P.3d 329. The Court of Appeals also determined that Employer/Insurer had statutory authority to select a health care provider (HCP) for Worker, despite the fact that they had denied his claim. *Id.* ¶ 1. Claimant petitioned this Court for a writ of certiorari pursuant to Rule 12–502 NMRA 2006, and we granted certiorari pursuant to NMSA 1978, Section 34–5–14(B)(4) (1972).

{3} We agree with the Court of Appeals that an employer has the right to select a treating HCP for a worker even when the employer denies a worker's claim for benefits. In this case, however, Employer/Insurer did not select a HCP for Worker in compliance with the procedure set forth in NMSA 1978, Section 52–1–49 (1990). The HCP selected by Employer/Insurer was not a treating HCP and his testimony was inadmissible. Therefore, there was insufficient evidence to support the WCJ's determination that Worker failed to prove causation as required by NMSA 1978, Section 52–1–28(B) (1987). The Court of Appeals is reversed on this issue. However, this matter is remanded to the WCJ for a determination as to whether Employer had "actual knowledge of the occurrence" so as to satisfy the notice requirements of NMSA 1978, Section 52–1–29 (1990).

## I. BACKGROUND

{4} Worker, a resident of Grants, New Mexico, was employed by Employer from 1985 to the date of his heart attack, October 2, 2000. Employer's coal mine is located in a remote area approximately 41 miles west of Grants. At the time of his heart attack, Worker had been working as a blade operator at the mine for approximately 10–11 years. Worker's primary job was to steer and operate a blade, which is a heavy equipment vehicle weighing several tons. Worker was required to level the dirt roads, cut ditches, and blade drill patterns. Worker also helped with other jobs when necessary. For example, there were times he helped with a "shovel move," which meant he physically got out of his blade and helped his co-workers on the ground untangle, move, and lift heavy cable. According to Worker, a shovel move could take anywhere from "three to eight hours, and sometimes more depending on where it went, and it took a lot of strength and endurance to run that much." Occasionally when the mine was short-handed, Worker would also get on the scraper or dozer.

{5} During his 10–11 years as a blade operator, Worker testified that he believed his job changed for the worse because "more was expected as the mine grew." As a result of the growth, there was more work to do; yet, the six-miles-per-hour speed of the blade remained the same. Sometimes it took longer to get to the location where the work was assigned than to actually do the work. Worker noticed differences in the last year or two, prior to his heart attack, because "there [were] more demands on ... heavy

equipment operators." Worker felt as though more was demanded from him because there were more projects, and even though there were two blade operators per shift, Worker believed the other blade operator was not doing his share of the duties required. Worker informed his supervisor that he had to do his own work, as well as some of the other blade operator's work, and it came to a point that Worker discussed this issue with his supervisor once or twice a week.

{6} Worker's regular work schedule required him to work twelve-hour days for four consecutive days. He had rotating shifts, which meant that he worked from 7:00 a.m. to 7:00 p.m. for two weeks, and then 7:00 p.m. to 7:00 a.m. for the subsequent two weeks. Because the mine was located in a remote area, Worker's commute to and from work required an additional two and a half hours each day. In addition to his regular work schedule, Worker was required to work overtime, sometimes without much notice. In fact, Worker had worked 53 overtime hours in September 2000. Although there were no written company policies prohibiting breaks or lunch breaks, Worker stated that he rarely took breaks because if he stopped his blade a supervisor would question the stop, which embarrassed Worker. Worker also testified that he rarely took a lunch break, and often chose to eat his lunch while working, because certain projects had to be done and he was more concerned about getting his job done. Worker testified that blade operators ate lunch inside their blades because "for our safety and the safety of anyone there that was working around the shovels, it was better to use the blade around the shovel during the lunch break and without the worry of one of those big trucks trying to run over you."

{7} Despite Worker's long commute, work days, rotating schedule, and mandatory overtime, Worker felt compelled to continue working for Employer because there were "no paying jobs" in the area, and he did not want to apply for unemployment or related benefits. Even though Worker had the same schedule for many years, he testified that he

felt as though his "body was always confused."

{8} In July 2000, Worker's immediate supervisor, Ernest Ortiz, informed Worker that he had four vacation days that he needed to use, so Worker filled out the paperwork and took a week off. When he returned from his vacation, Worker was told that the new production manager, Carl McMinn, wanted to talk to him. McMinn believed that Worker took one more day of vacation than he was entitled to take, so McMinn swore at Worker and accused him of stealing twelve hours of company time. Worker was upset about this confrontation and accusation, and he continued to brood over the incident until his heart attack.

{9} Worker testified that approximately a month before his heart attack, he started to notice some symptoms—more than usual heartburn, fatigue, and dizzy spells; however, after the incident with McMinn, he lived in fear of being fired for taking sick leave, so he did not make an appointment to see a doctor. Worker's regular work schedule only consisted of four work days each week, but he was putting in a lot of mandatory overtime, often without much notice, so it was difficult to schedule a doctor's appointment. Worker also did not think it was worth going to the doctor because if something was wrong with him, then the doctor would have advised him to stay home for a few days, and Worker did not want to miss work.

{10} During Worker's graveyard shift, on October 1–2, 2000, Worker complained of heartburn and stomach problems to some coworkers. Around midnight, Worker radioed Ortiz, his supervisor, for assistance. Ortiz did not respond, so Worker called again. Still no assistance was given. At approximately 1:30 a.m., Worker drove his blade to the change house and spoke directly to Ortiz, who was doing paperwork and in a bad mood. Worker informed Ortiz that he was not feeling well. Not wanting to be bothered, Ortiz told Worker to go home and failed to provide Worker with any medical treatment, even though Ortiz was a member of the emergency response team.

{11} Although Worker was not aware of it at the time, he was suffering from a heart attack. Worker drove himself home, went to sleep, and later that day saw Dr. Cubine. Dr. Cubine believed that Worker was having stomach problems and ordered an upper GI to be performed in ten days. In the meantime, she gave him some medicine to drink. Worker continued to feel sick, and went to the emergency room on the evening of October 3, 2000, where it was determined that Worker had suffered a heart attack. Worker was airlifted to the Heart Hospital of New Mexico in Albuquerque. He was treated for coronary artery disease and given an angioplasty the following morning.

{12} Worker also sought treatment from the New Mexico Heart Institute and Dr. Orchard, a general cardiologist. Dr. Orchard continued to treat Worker until the time of his death. Worker died on June 21, 2002. His death was the natural and direct result of the heart attack that he suffered on October 2, 2000.

{13} Worker filled out a written notice of accident report on April 17, 2001, and Employer/Insurer denied benefits on June 13, 2001. Worker then filed his complaint with the WCJ on July 16, 2001. Prior to a trial on the merits, Employer/Insurer filed a motion in limine to exclude all of the medical records of the Heart Hospital of New Mexico, the New Mexico Heart Institute, and Dr. Orchard, or in the alternative, to allow an independent medical examination (IME). The WCJ denied the motion in limine, denied the request for a second opinion or an IME, but allowed Employer/Insurer to select a HCP to treat Worker under a reservation of rights and without admitting the compensability of the claim under the Act. The WCJ also concluded that Worker selected his own HCP, which included Dr. Orchard, referrals, the Heart Hospital of New Mexico, and the New Mexico Heart Institute. Further, the records from these selected providers were authorized and admissible under Section 52–1–49 and NMSA 1978, Section 52–1–51(C) (1990, prior to 2005 amendment).

{14} Employer/Insurer then issued a Notice of Change under Section 52–1–49(C), to which Worker objected; Employer/Insurer wanted Dr. Shadoff to examine Worker. The WCJ concluded that Employer/Insurer was not entitled to execute a Notice of Change because Dr. Shadoff constituted Employer/Insurer's initial selection and the initial medical care provided under the Act. The WCJ then ordered Worker to cooperate with Dr. Shadoff's treatment.

{15} At trial, the deposition testimony of both Dr. Orchard and Dr. Shadoff was admitted. The WCJ was more persuaded by Dr. Shadoff's testimony and concluded that "Worker's heart attack and death were not caused by an accidental injury in the course and scope of, or arising out of, Worker's employment with Employer."

{16} Claimant raises three issues in her appeal to this Court. First, Claimant argues that the WCJ erred in allowing Employer/Insurer to select Worker's HCP after Employer/Insurer denied Worker benefits. Second, Claimant asserts the WCJ erred as a matter of law by adopting Dr. Shadoff's elevated causation standard of proof. Third, Claimant argues that the WCJ's finding, that Worker's heart attack was not caused by or in the scope of his employment, was not supported by substantial evidence. In order to resolve the issues presented, and provide some guidance to the WCJ on remand, we initially assume that Employer/Insurer received proper notice of Worker's accident. We recognize, however, that the notice issue has not yet been resolved, and this assumption does not reflect a resolution of the notice issue.

## II. DISCUSSION

{17} The issues on appeal require us to interpret several provisions of the Workers' Compensation Act ("the Act"). "This Court reviews the interpretation of a statute de novo." *Smith v. Ariz. Pub. Serv. Co.*, 2003–NMCA–097, ¶ 5, 134 N.M. 202, 75 P.3d 418. "Our main goal in statutory construction is to give effect to the intent of the legislature." *Archer v. Roadrunner Trucking, Inc.*, 1997–NMSC–003, ¶ 7, 122 N.M. 703, 930 P.2d 1155. "We look first to the plain meaning of the statute's words, and we construe the provisions of the Act together to produce a harmonious whole." *Smith*, 2003–NMCA–097, ¶ 5, 134 N.M. 202, 75 P.3d 418.

After we determine the meaning of the statutes, "we review the whole record to determine whether the WCJ's findings and award are supported by substantial evidence." *Id.*

### A. Employer/Insurer's Right to Choose a HCP for Worker

{18} Claimant argues that the WCJ erred by allowing Employer/Insurer a right to select Worker's initial HCP because Employer/Insurer denied Worker's claim for benefits. Claimant contends that Employer/Insurer did not have any rights under Section 52–1–49, because Worker did not have any rights under Section 52–1–49 prior to adjudication. Furthermore, Claimant argues the WCJ erred by allowing Dr. Shadoff to testify because he was neither a "treating" HCP nor authorized to provide an IME pursuant to Section 52–1–51(C).

{19} Section 52–1–28 requires a worker to establish a causal connection between "an alleged disability" and an accidental injury when causation is denied by expert testimony of a health care provider. Section 52–1–51(C) provides that "[o]nly a health care provider who has treated the worker pursuant to Section 52–1–49 NMSA 1978 or the health care provider providing the independent medical examination pursuant to this section may offer testimony" at a worker's compensation hearing. We believe the record in this case illustrates a circumstance the Legislature did not foresee. The WCJ and the Court of Appeals attempted to resolve the issue within the existing statutes, and so do we. We conclude that the Legislature intended to limit the use and number of experts in workers' compensation cases, but also to ensure medical treatment was not postponed. *See* §§ 52–1–49, –51; *see also Banks v. IMC Kalium Carlsbad Potash Co.,* 2003–NMSC–026, ¶ 28, 134 N.M. 421, 77 P.3d 1014 ("The Act limits testimony at the compensation hearing to a treating physician or a health care provider who has provided an independent medical examination pursuant to the Act."). The purpose of the workers' compensation administration was articulated in NMSA 1978, Section 52–5–1 (1990).

It is the intent of the legislature in creating the workers' compensation administra-

tion that the laws administered by it to provide a workers' benefit system be interpreted to assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers who are subject to the provisions of the Workers' Compensation Act. . . .

*Id.* The Legislature appears to have authorized both employer and worker an initial HCP selection, and then limited further selection to situations in which there was a disagreement about the proper treatment. *See* §§ 52–1–49, –51; *see also* 11.4.4.11 NMAC. The statutes and regulations do not directly address whether an employer has the right to make a HCP selection after it has denied coverage to a worker.

{20} The Court of Appeals believed that the pivotal issue was whether Dr. Shadoff was a properly authorized HCP under Section 52–1–49. *Grine,* 2005–NMCA–075, ¶ 9, 137 N.M. 649, 114 P.3d 329. If he was not, then his testimony concerning Worker's heart attack was not admissible under Section 52–1–51(C), and the WCJ could only rely on the testimony of expert Dr. Orchard. *Id.* The Court of Appeals held that Section 52–1–49 authorized Employer/Insurer to select a HCP for Worker, despite the fact that they denied Worker's claim. *Id.* ¶ 13. The Court of Appeals agreed with Claimant "that neither the Act nor our case law specifically states whether a denial of a claim prohibits an employer from selecting a health care provider." *Id.* After reviewing Section 52–1–49 and the workers' compensation regulations, the Court of Appeals concluded that "Section 52–1–49 must be read to allow the employer and the worker each to make a selection of a health care provider at some point in a case. The employer's right to make this selection would be eliminated if we were to adopt Worker's interpretation of the statute." *Id.*

{21} We agree that Section 52–1–49 does not preclude an employer from selecting a HCP after it has denied a worker's claim for benefits. Nevertheless, assuming Employer/Insurer received proper notice of Worker's accident, we would reverse the Court of Appeals' determination that Em-

ployer/Insurer made the initial HCP selection for Worker by requiring him to consult with Dr. Shadoff. We conclude that to be consistent with the Legislature's intent expressed in Sections 52–1–49 and 52–1–51, we should hold Dr. Shadoff was not authorized to testify under Section 52–1–51(C). *See Jurado v. Levi Strauss & Co.*, 120 N.M. 801, 907 P.2d 205 (Ct.App.1995) (holding that a doctor's written impairment report was inadmissible in a worker's compensation proceeding because the doctor neither treated the worker nor provided an IME).

{22} The Court of Appeals agreed with the WCJ and concluded that Dr. Shadoff was Employer/Insurer's initial HCP selection, while Dr. Orchard's treatment was "authorized health care." *Grine*, 2005–NMCA–075, ¶ 13, 137 N.M. 649, 114 P.3d 329; *see also* 11.4.4.11(C)(2)(c) NMAC ("Medical treatment provided to the Worker prior to the Employer's written decision to either select the HCP, or to permit the Worker to select the HCP, shall be considered authorized health care, the cost of which is to be born by the Employer."). According to the Court of Appeals, 11.4.4.11(C)(2)(c) NMAC "contemplates allowing an employer to exercise its rights under Section 52–1–49(B), even though the worker may have already obtained medical treatment before the employer makes its choice under the statute." *Grine*, 2005–NMCA–075, ¶ 13, 137 N.M. 649, 114 P.3d 329. The distinction between a qualified HCP under Sections 52–1–49 and 52–1–51(C), and authorized health care under 11.4.4.11(C)(2)(c) NMAC is not clear. We are not persuaded that authorized health care is equivalent to treatment by a qualified HCP. Rather, the regulations seem to serve the purpose of ensuring prompt medical attention for a work-related injury. Because neither party argues that Dr. Orchard's testimony was inadmissible, however, we need not address this distinction.

{23} Claimant argues that the WCJ and the Court of Appeals erred in allowing Dr. Shadoff's testimony. According to Claimant, Worker initially selected Dr. Orchard as his treating physician and the WCJ erred by concluding that Dr. Shadoff was the initial treating physician. Moreover, Dr. Shadoff

was not properly authorized as a treating physician under Section 52–1–49, through either an initial or second selection process. Similarly, he was not authorized to conduct an IME under Section 52–1–51(A). Claimant argues, therefore, Dr. Shadoff's testimony was inadmissible under Section 52–1–51(C). We agree with Claimant that Dr. Shadoff was neither a "treating" physician under Section 52–1–49, nor authorized to provide an IME under Section 52–1–51(A).

{24} If Employer had notice of the accident, it was required to "provide the worker in a timely manner reasonable and necessary health care services from a health care provider." Section 52–1–49(A). In doing so, Employer was entitled to make the initial HCP selection or to permit Worker to make the selection. Section 52–1–49(B). "If the decision of the employer is not communicated in writing to the worker, the employer shall be presumed, absent other evidence, to have selected the HCP initially." 11.4.4.11(C)(2)(b) NMAC. If Employer had notice and failed to communicate its HCP selection to Worker within a reasonable period of time, Dr. Orchard was Employer's initial selection. Under these circumstances, Dr. Shadoff was not a qualified HCP under Section 52–1–49, and his deposition testimony would have been inadmissible. On this record, we need not decide whether Dr. Orchard was Employer's initial selection.

{25} We cannot classify Dr. Shadoff as a "treating" physician within the meaning of Section 52–1–51(C) when he only met with Worker on one occasion for a total of ten minutes on February 15, 2002, more than sixteen months after Worker's heart attack. While we recognize that Dr. Shadoff was given Worker's medical records, deposition, and job description to review, we believe Dr. Shadoff's ten minute consultation with Worker falls short of "treatment," especially given the fact that this consultation occurred after Worker's claim for benefits had been denied and after Worker filed a complaint with the WCJ. We reiterate that "[t]he expertise of a treating physician is the training, experience and familiarity with the patient whom he or she is treating. The 'expert' testimony required by Section 52–1–28(B) re-

fers to testimony based on this training, experience and familiarity." *Banks*, 2003–NMSC–026, ¶ 22, 134 N.M. 421, 77 P.3d 1014. Dr. Shadoff may have been a well-trained and experienced cardiologist, but he lacked familiarity with Worker as a patient. Dr. Shadoff met with Worker for ten minutes and immediately concluded that Worker's heart attack was not work-related. Employer/Insurer's selection of Dr. Shadoff appears to be an attempt to rebut Dr. Orchard's opinion regarding causation, rather than an effort to treat Worker for his post-heart attack condition. Dr. Shadoff was not a treating HCP for purposes of Section 52-1-51(C).

{26} Dr. Shadoff also did not provide an IME pursuant to Section 52-1-51(C). The WCJ properly denied Employer/Insurer's request for an IME, because at the time of the request, there was no conflict between authorized medical providers as required by Section 52–1–51(A). *See Ramirez v. IBP Prepared Foods*, 2001–NMCA–036, ¶ 16, 130 N.M. 559, 28 P.3d 1100 ("disputes regarding medical issues must be between health care providers"). Additionally, prior to the 2005 amendment, an IME was not authorized to resolve an issue of causation. *Id.* ¶ 17. In *Ramirez*, the Court of Appeals stated:

> We do not believe that causation is a medical issue as contemplated by the IME statute. Causation involves medical opinion only when the employer denies causation. Then the worker is required to establish the causal connection by expert testimony of a health care provider. *See* NMSA 1978, § 52-1-28(B) (1987). Here, Employer denied causation, but sought the WCJ's assistance in getting its own expert to negate Worker's medical testimony. We do not believe that the legislature intended the IME statute to provide Employer with a medical expert to battle an existing medical provider on the issue of causation.

*Id.; but see* NMSA 1978, § 52–1–51(A) (2005) ("In the event of a dispute between the parties concerning ... *the cause of an injury* or any other medical issue, if the parties cannot agree upon the use of a specific independent medical examiner, either party may petition a workers' compensation judge for permission to have the worker undergo an independent medical examination.") (Emphasis added.) Because Dr. Shadoff was neither a treating physician, nor authorized to provide an IME, his testimony was inadmissible.

**B. Elevated Causation Standard of Proof**

{27} Claimant also argues that the WCJ erred as a matter of law by adopting Dr. Shadoff's opinion and his elevated causation standard, which required proof of "acute," "excessive," or "extraordinary" job stress. Claimant argues that a review of the WCJ's findings of fact and conclusions of law demonstrate this error. We do not think it is necessary to analyze whether Dr. Shadoff applied an elevated causation standard, because we do not believe that Dr. Shadoff's testimony should have been admitted.

**C. Substantial Evidence**

{28} On appeal, we apply a whole record review to determine whether there was substantial evidence to support the WCJ's conclusion that Worker's heart attack and death were not caused by an accidental injury in the course and scope of, or arising out of, Worker's employment with Employer. *See Herman v. Miners' Hosp.*, 111 N.M. 550, 552, 807 P.2d 734, 736 (1991). "When applying whole record review, the reviewing court 'views the evidence in the light most favorable to the agency decision, but may not view favorable evidence with total disregard to contravening evidence.' " *Id.* (quoting *Nat'l Council on Comp. Ins. v. N.M. State Corp. Comm'n*, 107 N.M. 278, 282, 756 P.2d 558, 562 (1988)). "Whole record review requires us to consider all the evidence properly admitted by the WCJ to determine whether there is substantial support for the judgment." *Sanchez v. Zanio's Foods, Inc.*, 2005–NMCA–134, ¶ 9, 138 N.M. 555, 123 P.3d 788. In this case, Dr. Shadoff's testimony was improperly admitted into evidence and, in light of our discussion above, we will not consider his opinion.

{29} We believe that on this record, Dr. Orchard should be considered a treating HCP for purposes of Section 52–1–51(C) and his opinion should be given due deference. *Banks*, 2003–NMSC–026, ¶ 22, 134 N.M. 421, 77 P.3d 1014 ("A treating

physician is uniquely qualified to give an opinion about his or her diagnosis of a patient and the admissibility of such testimony should be given due deference."). It was Dr. Orchard's opinion that Worker "was under extreme stress, both mental and physical, and long hours." Dr. Orchard believed that it was "more likely than not, that the stresses of his work triggered his heart attack." Without Dr. Shadoff's conflicting testimony, Dr. Orchard's testimony would be uncontradicted. In New Mexico, we have adopted and applied an uncontradicted medical evidence rule in reviewing a worker's proof of causation. *Banks*, 2003–NMSC–026, ¶ 35, 134 N.M. 421, 77 P.3d 1014.

> The uncontradicted medical evidence rule . . . is an exception to the general rule that a trial court can accept or reject expert opinion as it sees fit. . . . The rule is based on NMSA 1978, Section 52–1–28(B), which requires the worker to prove causal connection between disability and accident as a medical probability by expert medical testimony. Because the statute requires a certain type of proof, uncontradicted evidence in the form of that type of proof is binding on the trial court.

*Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 70, 716 P.2d 645, 648 (Ct.App.1986). There are, of course, exceptions to the uncontradicted evidence rule. *Id.*

> Uncontradicted testimony need not be accepted as true if (1) the witness is shown to be unworthy of belief, or (2) his testimony is equivocal or contains inherent improbabilities, (3) concerns a transaction surrounded by suspicious circumstances, or (4) is contradicted, or subjected to reasonable doubt as to its truth or veracity, by legitimate inferences drawn from the facts and circumstances of the case.

*Id.* at 70–71, 716 P.2d at 648–49.

{30} We do not believe that any of the exceptions apply in this case. Dr. Orchard testified that he has treated over 10,000 heart patients during his 30–year career, and in only five of those cases, including Worker's case, did he believe that work-related stress contributed to his patients' heart attacks. Dr. Orchard based his opinion on the totality of Worker's circumstances and believed that there were a "series of circumstances or a series of events . . . on the job that . . . triggered his heart attack." Dr. Orchard did not immediately conclude that Worker's heart attack was work-related. He formed his opinion after treating Worker for several months. Dr. Orchard was aware of Worker's pre-existing conditions, his work schedule and mandatory overtime, and the confrontation with McMinn. Dr. Orchard testified that Worker did not report any stress from his family situation, and Dr. Orchard believed that Worker had a happy marriage, a supportive wife, and a good family.

{31} Dr. Orchard's uncontradicted testimony is binding with regard to causation, therefore, substantial evidence does not support the WCJ's dismissal of Worker's complaint for a lack of causation. Claimant has met her burden and established a causal connection between Worker's heart attack and his work-related stress as a medical probability by expert medical testimony.

**D. Notice**

{32} Throughout the course and proceedings of this case, Employer/Insurer continually has asserted the defense of notice pursuant to Section 52–1–29; however, the WCJ did not address the notice issue because she denied Worker's claim on other grounds. We believe it was error not to address the notice issue, because this case turns on whether proper notice of the claim was given to Employer. We remand this issue to the WCJ for an evidentiary hearing to determine whether Employer had notice consistent with Section 52–1–29.

{33} An injured worker is required to give his or her employer written notice of an accident within fifteen days of the accident, unless the worker is unable to give notice within fifteen days, in which case he or she should give notice as soon as possible, but no later than sixty days after the accident. *See* § 52–1–29(A). Actual knowledge is an exception to the written notice requirement. *Id.* ("No written notice is required to be given where the employer or any superintendent or foreman or other agent in charge

of the work in connection with which the accident occurred had actual knowledge of its occurrence.").

{34} The purpose of the notice requirement is "to protect the employer, allowing it to investigate the facts and circumstances surrounding an injury while the facts are accessible." *Herman,* 111 N.M. at 555, 807 P.2d at 739. Moreover, proper notice "allows the employer to act to prevent the filing of fictitious claims and to make sure an injured employee receives proper medical attention." *Id.* In this case, Worker did not fill out a "Notice of Injury or Occupation Disease Report" until April 17, 2001, more than six months after his heart attack. Therefore, the issue is whether Employer, any superintendent, foreman, or other agent in charge of Worker's work on the night of his heart attack had actual notice of the accident.

{35} Worker testified that after he was informed that he would be airlifted to the Heart Hospital of New Mexico, on October 3, 2000, his brother-in-law called Wendal Horton, the general production supervisor, and told him about Worker's heart attack and that Worker would be at the Heart Hospital of New Mexico. Thus, Employer did have notice of Worker's heart attack and his hospitalization. Knowledge of a worker's heart attack and his hospitalization alone, however, are insufficient to excuse written notice. *Wilson v. Navajo Freight Lines, Inc.,* 73 N.M. 470, 472–73, 389 P.2d 594, 595–96 (1964). In *Wilson,* this Court stated, "To here determine that notice of a heart attack which occurred on the job is knowledge of an accident, or even an injury, would be to our minds stretching the facts beyond recognition, and would be a departure from our prior decisions." *Id.* at 473, 389 P.2d at 596.

{36} The distinction between an accident and an injury is important, particularly to this case. *See Herman,* 111 N.M. at 555, 807 P.2d at 739 ("the employer must have knowledge of the accident, not merely the injury"). In *Herman,* this Court said that "where a dependent seeks benefits based on the worker's death by heart attack, the death is analyzed as the disability, the heart attack as the injury, and the employ-ment-related stress as the accident." *Id.* at 554, 807 P.2d at 738. In accordance with *Herman,* Worker's heart attack was the injury that he suffered and his employment-related stress was the accident.

{37} To meet the actual notice requirement, "[a]n element of causation must be present, and the employer must have knowledge that a work-related accident caused the injury." *Id.* at 555, 807 P.2d at 739. We believe the issue of actual knowledge requires a factual determination, and therefore, remand this issue to the WCJ. "The totality of the facts and circumstances determine whether an employer has actual knowledge of a compensable injury," *id.,* and we are not in a position to weigh the evidence. On remand, Claimant must show that Employer or its agents had actual knowledge of Worker's employment-related stress, which was the accident causing his heart attack. *See, e.g., id.* at 554, 807 P.2d at 738 (finding that the Hospital knew of the decedent's heart attack, her stressful schedule, and an argument that she had with one of the hospital's surgeons on the day of her death).

{38} We note that the notice requirement within Section 52–1–29 also facilitates the prompt medical treatment we believe the Legislature intended injured workers would have. Further, the regulations the WCJ have provided for determining when the Employer is presumed to have made the initial selection suggest that an employer may inform its workers at the time of employment how to secure prompt medical attention or, upon notice under Section 52–1–29, either allow an injured worker to select a HCP or make its own initial selection. Under the regulations, the notice requirement appears to be a threshold issue in applying Section 52–1–49. We conclude the WCJ must determine whether Employer had notice pursuant to Section 52–1–29 prior to determining whether or not Claimant is entitled to benefits.

## III. CONCLUSION

{39} We reverse and remand for further proceedings consistent with this opinion.

{40} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, and EDWARD L. CHÁVEZ, Justices.