## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: April 9, 2014

Docket No. 32,246

LYNDA BRASHAR,

       Worker-Appellant,

v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA d/b/a LOS ALAMOS
NATIONAL LABORATORIES,

       Employer/Insurer-Appellee.

APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION
Terry S. Kramer, Workers' Compensation Judge

Lynda R. Brashar
Ohkay Owingeh, NM

Pro Se Appellant

Allen, Shepherd, Lewis, & Syra, P.A.
Kimberly A. Syra
Albuquerque, NM

for Appellee

## OPINION

**VIGIL, Judge.**

**{1}**    Lynda Brashar (Worker) filed a claim for workers' compensation benefits, alleging she suffered from heavy metal toxicity due to toxic exposure she experienced in her employ as a chemistry technician at the Los Alamos National Laboratories (Employer). The workers' compensation judge (WCJ) denied her claim. Worker appeals, arguing, among other things, that the WCJ erred in admitting the testimony of Dr. Don Fisher, the only expert testimony supporting no workplace causation. Worker contends that Dr. Fisher's

1

testimony was inadmissable because he was neither her treating physician nor a health care provider who provided an independent medical examination (IME). We agree with Worker and reverse.

**BACKGROUND**

**{2}**     The following facts are undisputed. Worker worked as a chemistry technician at Los Alamos National Laboratories. Her duties included analyzing samples to determine the concentration of materials in the samples, including testing for the presence of heavy metals. Worker notified Employer as early as June 5, 1997, that she was concerned she might be experiencing symptoms from workplace exposure to mercury. Worker's symptoms began on April 10, 1997, when she experienced an episode of fecal incontinence while at work. She was then hospitalized for three days beginning April 14, 1997, for a kidney infection. Between 1997 and 2006, Worker sought treatment from several providers and was seen twenty-three times in Employer's occupational medicine unit to address numerous problems including night sweats, possible menopause, depression, severe fatigue, weight loss, mood swings, anxiety, urinary tract infection, candida, diarrhea, and fever. She also took several medical leaves of absence between August 1997 and October 2005, until she was no longer able to work beginning November 2005.

**{3}**     A formal hearing was held on February 17, 2012, to address Worker's claim. Dr. Ralph Luciani, Dr. Deborah Werenko, and Dr. Fisher testified by deposition.

**{4}**     Worker started seeing Dr. Luciani in 1997 regarding her heavy metal toxicity concerns. He testified that the symptoms she complained of including lethargy, depression, yeast infections, irritable bowel syndrome, slightly elevated anti-nuclear antibody tests, night sweats, periodic diarrhea, and insomnia could be attributed to heavy metal toxicity. Dr. Luciani stated that based on the elevated mercury levels in Worker's urine after a chelation treatment he ordered, he concluded that she probably had some significant exposure to mercury from a source unknown to him. He testified that, in his opinion, Worker was probably exposed to a toxic substance prior to her hospitalization in April 1997, and her toxic injury was a result of her employment with Employer.

**{5}**     Dr. Werenko, who began seeing Worker in November 2006, testified that she had diagnosed Worker with heavy metal toxicities including mercury, cadmium, and lead. She explained that at her recommendation, Worker had undergone x-ray fluorescent testing to determine the level of lead in her bones and that the results showed an amount of lead outside the normal range. Dr. Werenko also reviewed files containing information on the actual samples Worker handled during the period of possible exposure. She testified that in her opinion, Worker suffered from long-term toxic exposure to heavy metals that occurred while performing chemical analyses between 1995 and April 1997.

**{6}**     Dr. Fisher testified that he found no evidence of overexposure to mercury or lead. Worker had seen Dr. Fisher one time on November 18, 2005, at the recommendation of Dr.

William Brady, the medical director for Employer's occupational medicine unit. After his examination, Dr. Fisher concluded in his report that he found no evidence whatsoever that Worker had ever had mercury or lead or other metal poisoning. Dr. Fisher testified that, in his opinion, Worker's broad subjective complaints were consistent with the other possible causes of depression and chronic fatigue.

**{7}** The WCJ found that the medical opinions regarding causation varied, with "some" relating symptoms to work and "[o]ther medical providers," concluding that Worker's symptoms were more consistent with depression and chronic fatigue and unrelated to work. The WCJ found that "[t]he medical opinions based on work related exposures assume that Worker inhaled vapors or otherwise introduced heavy metals into her body despite no direct evidence to support the same." The WCJ concluded that Worker had failed to meet her burden and denied her claim.

## INADMISSIBILITY OF DR. FISHER'S TESTIMONY

**{8}** On appeal, Worker contends that the testimony of Dr. Fisher consisting of his report and his depositions was improperly admitted by the WCJ because Dr. Fisher was neither a treating physician nor a doctor that had performed an IME. Worker filed a motion in limine to exclude Dr. Fisher's testimony on the same grounds, which the WCJ addressed at the opening of the formal hearing. The WCJ heard arguments from both parties and, although he advised that he was inclined to admit all medical records and testimony, he deferred making his ruling until he issued his order. The compensation order states that the depositions of Dr. Fisher were admitted, as was the exhibit containing all Worker's medical records. Because we agree with Worker that Dr. Fisher's testimony was inadmissable and that issue is dispositive, we decline to address Worker's other arguments she raises on appeal. Further pertinent facts relevant to this issue are discussed below.

**{9}** "With respect to the admission or exclusion of evidence, we generally apply an abuse of discretion standard where the application of an evidentiary rule involves an exercise of discretion or judgment, but we apply a de novo standard to review any interpretations of law underlying the evidentiary ruling." *Dewitt v. Rent-A-Ctr., Inc.*, 2009-NMSC-032, ¶ 13, 146 N.M. 453, 212 P.3d 341. "In reviewing a WCJ's interpretation of statutory requirements, we apply a de novo standard of review." *Id.* ¶ 14.

**{10}** In *Hall v. Carlsbad Supermarket/IGA*, 2008-NMCA-026, ¶ 10, 143 N.M. 479, 177 P.3d 530, we stated that the Workers' Compensation Act (the Act), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2013), "limits the testimony that can be provided by medical experts at a workers' compensation hearing to testimony by a treating physician or a health care provider who has provided an [IME] pursuant to the Act." (internal quotation marks and citation omitted); *see* § 52-1-51(C). In 1997 when Worker notified Employer of her concerns, Section 52-1-51(A) provided in pertinent part, "In the event of a dispute concerning any medical issue, *if the parties cannot agree upon the use of a specific independent medical examiner*, either party may petition a workers' compensation judge for

permission to have the worker undergo an [IME]." 1990 N.M. Laws (2d S.S.), ch. 2, § 22 (emphasis added). Section 52-1-51(A) was amended in 2005. In pertinent part, the amendment changed the circumstances under which an IME is authorized, permitting the use of an IME "[i]n the event of a dispute *between the parties*" concerning any medical issue, including a dispute about "the cause of an injury." 2005 N.M. Laws, ch. 150, § 1; *see Grine v. Peabody Natural Res.*, 2006-NMSC-031, ¶ 26, 140 N.M. 30, 139 P.3d 190 (explaining that the 1997 version of Section 52-1-51(A) requires a dispute regarding a medical issue between authorized health care providers and that prior to the 2005 amendment, an IME was not authorized to resolve an issue of causation).

**{11}** In this case, both Worker and Employer cite to the 2005 version of Section 52-1-51(A). As we previously explained in *Hall*: "This Court only applies revised provisions of the Act prospectively, including procedural provisions, absent an express mandate by the [L]egislature to apply the provision retroactively or a compelling reason for doing so." *Hall*, 2008-NMCA-026, ¶ 10 n.1. Although Worker saw Dr. Fisher on November 18, 2005, after the July 2005 amendment, the WCJ found that Worker had notified Employer as early as June 5, 1997, that she was concerned she might be experiencing symptoms from workplace exposure to mercury giving Employer legally sufficient notice of Worker's claim. Thus, her claim accrued prior to the 2005 amendment. *See Aragon v. Furr's, Inc.*, 1991-NMCA-080, ¶ 5, 112 N.M. 396, 815 P.2d 1186 (explaining that a claim accrues either on the date of injury or, if "there is a period of time between the date of the accident or the date of the injury and the date that the injury becomes compensable" then the claim accrues when the "claimant knows or should know that the injury is compensable"). Since Worker's claim accrued prior to the effective date of the 2005 amendment, only the 1997 version of the statute applies here. Thus, all subsequent references to Section 52-1-51(A) are to the 1997 version unless otherwise indicated.

**{12}** Employer does not argue that Dr. Fisher was a treating physician. Rather, Employer contends that Dr. Fisher was an IME doctor by agreement. Worker asserts that Dr. Fisher was not an IME doctor as a matter of law because there was no medical dispute at the time she saw Dr. Fisher, nor any evidence that the parties agreed Dr. Fisher would address a medical dispute with an IME. We agree with Worker that Dr. Fisher was not an IME doctor for several reasons.

**{13}** First, at the time Worker saw Dr. Fisher, Section 52-1-51(A) was inapplicable because she had not yet filed a claim for workers' compensation benefits. By its terms, the process for selecting an IME outlined in Section 52-1-51 occurs within the context of a claim. The purpose of an IME is to assist the WCJ in deciding which way to rule in the case of a dispute among authorized health care providers. Thus, an IME cannot take place unless a claim has been filed. Worker saw Dr. Fisher on November 18, 2005, and she did not file her claim for compensation until November 1, 2006. Accordingly, the evaluation by Dr. Fisher was not an IME under Section 52-1-51(A).

**{14}** Second, there was no dispute as to a medical issue among authorized health care

4

providers when Dr. Fisher examined Worker as required by Section 52-1-51(A). A letter written to Worker from Employer explains the circumstances under which Worker saw Dr. Fisher. The letter states that Dr. Brady recommended she be evaluated by Dr. Fisher. The letter does not use the term "independent medical evaluation" nor does it reference that the purpose of the evaluation by Dr. Fisher was to resolve a dispute among health care providers regarding a medical issue. It indicates that her possible work-related exposure had been addressed in 2001 and was deemed not work-related, but that Employer wanted to revisit her concerns in light of new information in order to make a decision regarding whether her medical problems were compensable. On its face, this letter demonstrates only that Employer desired to further investigate Worker's medical issues.

**{15}** Finally, even if Worker had filed a claim and there was evidence of a dispute among health care providers concerning a medical issue, Section 52-1-51(A) requires that the parties agreed on the selection of an independent medical examiner, in the absence of an appointment of an IME doctor by the WCJ. Employer does not argue nor refer to any evidence that the WCJ appointed Dr. Fisher to conduct an IME. Instead, Employer relies on the provision in Section 52-1-51(A) that provides for the option for parties to agree on the selection of an independent medical examiner to imply that Worker agreed to see Dr. Fisher for an IME. As this Court has previously noted, "Although Section 52-1-51 appears to contemplate circumstances in which parties may enter into agreements to have an IME conducted, the Act provides no provisions specifically addressing what must be contained in the agreement." *Hall*, 2008-NMCA-026, ¶ 12.

**{16}** Although it remains unclear what is required in the agreement, there is no evidence of any formal agreement between the parties here. Employer contends that "Dr. Fisher viewed his role as that of an IME" and that "Worker willingly participated in the IME." To the extent that Employer is arguing that because it viewed Dr. Fisher as an independent medical examiner and Worker agreed to see him, he is therefore an independent medical examiner, we disagree. The letter to Worker that we referenced above informs Worker that Dr. Brady recommended she see Dr. Fisher, and the letter specifically states that Employer had not authorized payment for any other evaluation or treatment besides by Dr. Fisher. The Act does not permit the unilateral selection of an independent medical examiner. *See generally* § 52-1-51; *see, e.g.*, *Jurado v. Levi Strauss & Co.*, 1995-NMCA-129, ¶ 19, 120 N.M. 801, 907 P.2d 205 ("Section 52-1-51(A) does not allow the worker to make a unilateral decision as to which doctor to see for an IME."). On the contrary, we conclude that there must be evidence that the parties mutually agreed to the selection of a particular independent medical examiner specifically, with the understanding that the doctor selected would be conducting an IME. Employer cites to no evidence of an agreement between Worker and Employer to select Dr. Fisher as an IME doctor under Section 52-1-51(A).

**{17}** For these reasons, we conclude that because Dr. Fisher was not a treating physician nor an IME doctor, his testimony was inadmissable. *See Grine*, 2006-NMSC-031, ¶ 26 (holding that the testimony of a doctor who was neither a treating physician nor an IME doctor was inadmissable); *Jurado*, 1995-NMCA-129, ¶¶ 20-24 (excluding a doctor's written

evaluation report, which was considered testimony, because the employer did not agree to an IME by the doctor, and the worker did not petition the WCJ for permission to undergo another IME).

**CONCLUSION**

**{18}**    The compensation order is reversed, and the case is remanded to the Workers' Compensation Administration for further proceedings consistent with this Opinion.

**{19}    IT IS SO ORDERED**.

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**JONATHAN B. SUTIN, Judge**

6